WILSON, J.
*493 ***295 Plaintiff Michael Carlson, individually and in his capacity as administrator of his deceased wife's estate and as assignee of William Porter, commenced this action pursuant to Insurance Law § 3420(a)(2) to collect on certain insurance policies issued to DHL Worldwide Express, Inc. by National Union Fire Insurance Co. and American Alternative Insurance Co. (AAIC). Mr. Carlson previously had obtained a judgment against MVP Delivery and Logistics, Inc. and William Porter (see Carlson v. Porter, 53 A.D.3d 1129, 861 N.Y.S.2d 907 [4th Dept.2008], lv denied 11 N.Y.3d 708, 868 N.Y.S.2d 601, 897 N.E.2d 1085 [2008] ). On appeal, we consider whether Mr. Carlson has sufficiently pleaded that MVP is an "insured" under DHL's policies, and whether the policies fall within the purview of Insurance Law § 3420 as policies "issued or delivered" in New York. We hold that dismissal of the first cause of action pursuant to Insurance Law § 3420(a)(2) and (b) was improper as to National Union and AAIC. Whether MVP was an "insured" under DHL's policies presents a question of fact to be resolved ***296 by the trier of fact. Additionally, the meaning of "issued or delivered" is informed by our decision in Preserver Ins. Co. v. Ryba, 10 N.Y.3d 635, 862 N.Y.S.2d 820, 893 N.E.2d 97 (2008), and thus, section 3420 encompasses situations where both insureds and risks are located in this state.
I.
Claudia Carlson was killed when a truck painted with DHL's logo, owned by MVP and driven by William Porter, an employee of MVP, crossed the double-yellow divider and hit her car head on. Prior to the accident, Mr. Porter had driven the truck home on a scheduled break, when he *494 **104 learned that his son had been in an accident. Mr. Porter drove the truck to the accident site, and while driving the truck to retrieve a tool to repair his son's vehicle, Mr. Porter veered into Mrs. Carlson's car, killing her. A jury awarded her husband, individually and as administrator of her estate, $20 million against MVP, Mr. Porter and DHL. The Appellate Division set aside the verdict against DHL and dismissed the complaint against it, concluding that DHL was not vicariously liable under the doctrine of respondeat superior. The court also found damages to be excessive, and Mr. Carlson stipulated to a reduced judgment of $7.3 million. MVP's insurer paid Mr. Carlson approximately $1.1 million, and Mr. Porter assigned to Mr. Carlson whatever rights Mr. Porter had to any other insurance coverage.
At the time of the accident, DHL and MVP were parties to a cartage agreement, pursuant to which MVP used its fleet of trucks and employees to perform DHL's package delivery services in Western New York. DHL had three insurance policies relevant here: (1) a $3 million primary policy issued by National Union, which included "hired auto" coverage insuring DHL, its employees, and "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow"; (2) a $2 million excess insurance policy with AAIC, with the exact same coverage as the National Union policy; and (3) a $23 million umbrella policy with National Union, which covered vehicles "hired by [DHL] or on [DHL's] behalf and used with [DHL's] permission." American International Group, Inc. and AIG Domestic Claims, Inc. (collectively, AIG) did not issue any relevant policy to DHL.
Mr. Carlson commenced this action against National Union, AAIC, AIG, and DHL, alleging five causes of action. The first asserted a claim under Insurance Law § 3420(a)(2) and (b), ***297 against National Union, AAIC and AIG, to satisfy the outstanding judgment. The second, third, and fourth causes of action asserted damages against National Union, AAIC and AIG for misrepresentations, bad faith refusal to settle, and violations of General Business Law § 349, respectively. The fifth cause of action sought damages against DHL and AIG for conspiracy.
Defendants moved to dismiss the complaint in its entirety. As to the first cause of action, AAIC moved to dismiss on the ground that section 3420 did not permit a claim against it because its policy, initially issued by it to DHL's predecessor, Airborne Inc. (headquartered in Washington), and later assumed by DHL (headquartered in Florida), was not "issued or delivered" in New York. Supreme Court denied that motion, and allowed discovery to proceed on the issue of coverage. After limited discovery had occurred, Supreme Court granted the motions and cross motion to the extent of dismissing causes of action 2, 3 and 5 of the complaint, but refused to dismiss the first and fourth causes of action.
The Appellate Division dismissed Mr. Carlson's General Business Law § 349 claim as to all remaining defendants (see Carlson v. American Intl. Group, Inc., 130 A.D.3d 1479, 1482, 12 N.Y.S.3d 715 [4th Dept.2015] ). The Appellate Division also dismissed the first cause of action. As to AIG, the Appellate Division concluded that because the two AIG entities established that they are not insurers, no section 3420 claim lay against them (see id. at 1480, 12 N.Y.S.3d 715 ). The Appellate Division held that Mr. Carlson could not state a claim against National Union because (a) the MVP vehicle was not a "hired automobile" and (b) DHL could not grant MVP permission to use it (see id. at 1481, 12 N.Y.S.3d 715 ). In a companion appeal, the *495 **105 Appellate Division determined that the AAIC policy was not issued or delivered in New York and dismissed the first cause of action against AAIC (see Carlson v. American Intl. Group, Inc., 130 A.D.3d 1477, 1477-1478, 16 N.Y.S.3d 637 [4th Dept.2015] [concluding that the parties and Supreme Court had "improperly conflated the phrase 'issued or delivered' with 'issued for delivery' "] ).
II.
On a motion to dismiss for failure to state a cause of action, the complaint must be liberally construed, and courts must provide a plaintiff with every favorable inference (see 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 152, 746 N.Y.S.2d 131, 773 N.E.2d 496 [2002] ; Leon v. Martinez, 84 N.Y.2d 83, 87, 614 N.Y.S.2d 972, 638 N.E.2d 511 [1994] ; CPLR 3026 ;
***298 see also Held v. Kaufman, 91 N.Y.2d 425, 432, 671 N.Y.S.2d 429, 694 N.E.2d 430 [1998] ["every favorable inference must be afforded the facts alleged in the complaint and in the various motion papers submitted by (the plaintiff)"] ). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" ( EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19, 799 N.Y.S.2d 170, 832 N.E.2d 26 [2005] ).
"Under CPLR 3211(a)(1), a dismissal is warranted only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law. In assessing a motion under CPLR 3211(a)(7), however, a court may freely consider affidavits submitted by the plaintiff to remedy any defects in the complaint and the criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one" ( Leon v. Martinez, 84 N.Y.2d 83, 88, 614 N.Y.S.2d 972, 638 N.E.2d 511 [1994] [internal quotation marks and citations omitted] ).
Here, Mr. Carlson submitted an expert affidavit providing support for the propositions that, under industry custom and practice, MVP's trucks were hired autos used with DHL's permission. Defendants offered no contrary expert opinion, and challenged the expert's opinions neither here nor below. Although they remain free to do so at a later stage of the proceedings, at this stage the expert's opinions concerning insurance industry custom and practice as to the comprehensive coverage of hired fleets, even when trucks within a fleet are at times not used for business purposes, are sufficient to defeat a motion to dismiss.
A.
As to the hired auto issue, dismissal on that ground was erroneous, for two additional reasons. First, defendants and the Appellate Division rely on the contract of insurance, without reference to extrinsic evidence, to conclude that the truck driven by Mr. Porter was not a hired auto, thus entitling them to dismissal. However, as Mr. Carlson argues, and defendants admit, a portion of the insurance contract, the schedule of hire, has not been produced. According to the expert, the schedule of hire would show that DHL's insurance policies cover all of MVP's vehicles. Mr. Carlson also points to evidence concerning the underwriting of the policies, which demonstrates that DHL's policies were priced to cover MVP's trucks ***299 as hired autos.[1] If the schedule of hire exists, its *496 **106 production is essential to determination of the full content of the contract; it would be error to dismiss the coverage claim based on only part of a contract, particularly where a highly germane portion is missing.[2] If the schedule of hire has been lost or destroyed, it would likewise be error to dismiss the coverage claim, because Mr. Carlson would be entitled to attempt to prove the missing portion by parol evidence (see Belknap v. Witter & Co., 92 A.D.2d 515, 517, 460 N.Y.S.2d 1005 [1st Dept.1983] ["an incomplete contract ... falls within one of the limited exceptions to the parol evidence rule"], affd. 61 N.Y.2d 802, 473 N.Y.S.2d 948, 462 N.E.2d 125 [1984] ) or, perhaps, would be entitled to an adverse inference based on defendants' duty to maintain the schedule (see Pegasus Aviation I, Inc. v. Varig Logistica S.A., 26 N.Y.3d 543, 551, 26 N.Y.S.3d 218, 46 N.E.3d 601 [2015] ; CPLR 3126 ).
Defendants' argument that the schedule of hire would have been unlikely to list MVP's vehicles individually, and therefore defendants should prevail as a matter of law, is in any event foreclosed by our decision in Jefferson Ins. Co. of N.Y. v. Travelers Indem. Co., 92 N.Y.2d 363, 370, 681 N.Y.S.2d 208, 703 N.E.2d 1221 (1998), in which we held: "[t]hat the van is not specifically listed [in the schedule of hired and non-owned coverage] is not determinative" of coverage, because the policy "listed 'N.Y.' as the State in which such coverage would apply, and also listed a 'Rate per each $100 cost of hire' and a premium amount."
Second, the insurance policies do not define "hired auto," and neither the Appellate Division nor defendants point to any industry-standard definition. Defendants argue, and we agree, that the degree of control exercised by DHL over MVP's trucks is pivotal to the determination of whether they are hired autos. However, the issue of control is fact-specific. The cartage agreement contains some terms militating against a finding of control; for example, section 3.3 of the cartage agreement gives MVP control over the manner of performance, including the ***300 number of vehicles and routing of the vehicles, and section 3.5.2 makes MVP responsible for the maintenance of the vehicles. The cartage agreement also contains terms that militate in favor of finding that DHL exercised substantial control over MVP's trucks. For example, DHL required all MVP trucks used for DHL's business to have DHL's paint scheme and identifying marks; DHL imposed maintenance requirements for the vehicles, and required that any necessary repairs to the vehicles be made and documented in accordance with procedures established by DHL; DHL specified the types of vehicles to be used for different types of deliveries; and DHL required MVP to use DHL's routing software. MVP was prohibited from making deliveries for a DHL competitor; even if MVP wanted to use its trucks to make a delivery for a non-competitor, it had to obtain DHL's permission and remove DHL's marks from the truck; and MVP could not retain any third parties to perform its work without DHL's prior written authorization. Those substantial restrictions *497 **107 on MVP's ownership and ability to use its trucks go well beyond simply controlling DHL's intellectual property and brand.
Most significantly for the purpose of this appeal, determining the extent of control is not limited to the face of the contract, but concerns the actual degree of control exercised by DHL over MVP. Mr. Carlson, who obtained some limited discovery, has pointed to evidence supporting the proposition that DHL actually exercised substantial control over MVP's trucks.[3] For example, MVP's entire fleet was used exclusively for DHL deliveries; DHL prescribed the make and model of the vehicles to be used by MVP; MVP's vehicles were garaged in DHL's facility; DHL had keys to MVP's offices, which were located inside the DHL facility; DHL dispatched MVP drivers and owned the equipment used to do so; DHL sent MVP drivers instructions via text message; DHL provided routing specifications for express shipments and required MVP to follow them; DHL required MVP to collect money on COD (collect on delivery) shipments and remit those monies to DHL; and if a ***301 customer had a problem, MVP was required to contact DHL or tell the customer to do so. All MVP employees were required to wear DHL uniforms, DHL audited MVP's safe driving practices, and DHL regularly examined MVP's routes and adjusted them.
Contrary to the Appellate Division's holding, the fact that the cartage agreement labels MVP an "independent contractor" is not dispositive of the issue of control, but is a factor to be weighed with others. In Matter of Rivera (State Line Delivery Serv.-Roberts), 69 N.Y.2d 679, 682, 512 N.Y.S.2d 14, 504 N.E.2d 381 (1986), we noted that "whether the relationships of the operators-deliverers with the delivery companies is that of employees or independent contractors involves a question of fact as to whether there is evidence of either control over the results produced or over the means used to achieve the results." In various other contexts, we and other courts have held that the determination of whether someone is an independent contractor is a fact-specific question (see e.g. Matter of Empire State Towing & Recovery Assn., Inc. [Commissioner of Labor], 15 N.Y.3d 433, 437, 912 N.Y.S.2d 551, 938 N.E.2d 984 [2010] ; Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 [2d Cir.1999] ; Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 [2d Cir.1988] ; Cross v. Supersonic Motor Messenger Courier, Inc., 140 A.D.3d 503, 504, 140 A.D.3d 503 [1st Dept.2016] [concluding that whether delivery driver was employee or independent contractor was a question of fact where, although the contract labeled the driver an independent contractor, "he was required to maintain insurance in an amount dictated by Continental, his delivery process was controlled by the Continental dispatcher, he used Continental's forms, was required to wear a Continental shirt, and the truck he drove bore the Continental logo"] ).
Although we express no opinion as to whether Mr. Carlson will ultimately succeed in demonstrating that the MVP vehicle constituted a "hired auto," defendants have not shown that, as a matter of law, *498 **108 Mr. Carlson failed to "manifest any cause of action cognizable at law" ( Guggenheimer v. Ginzburg, 43 N.Y.2d 268, 275, 401 N.Y.S.2d 182, 372 N.E.2d 17 [1977] ) or that defendants submitted " 'documentary evidence [to] conclusively establish[ ] a defense to the asserted claims as a matter of law' " ( 98 N.Y.2d at 152, 746 N.Y.S.2d 131, 773 N.E.2d 496 ).[4] ***302 B.
As to the issue of whether DHL granted "permission" to MVP to use the vehicle in question, dismissal on that ground was also erroneous.[5] "Permission" is not defined in the insurance agreement. "While the rights and obligations of parties under insurance contracts should be determined by the specific language of the policies, if the language of the policy is susceptible of two reasonable meanings, the parties may submit extrinsic evidence of their intent at the time of contracting" ( Newin Corp. v. Hartford Acc. & Indem. Co., 62 N.Y.2d 916, 919, 479 N.Y.S.2d 3, 467 N.E.2d 887 [1984] [citations omitted] ). There is a well-understood meaning of permission in the context of motor vehicle liability insurance, which turns not on whether the driver had permission to use the vehicle for the particular activity at issue, but on whether the driver had permission to use the vehicle at all (i.e. the distinction between a permissive user and a thief) (see Motor Veh. Acc. Indem. Corp. v. Continental Natl. Am. Group Co., 35 N.Y.2d 260, 263-265, 360 N.Y.S.2d 859, 319 N.E.2d 182 [1974] ; Murdza v. Zimmerman, 99 N.Y.2d 375, 381, 756 N.Y.S.2d 505, 786 N.E.2d 440 [2003] ; State Farm Mut. Auto. Ins. Co. v. Taveras, 71 A.D.3d 606, 606, 898 N.Y.S.2d 119 [1st Dept.2010] ; Lancer Ins. Co. v. Republic Franklin Ins. Co., 304 A.D.2d 794, 797, 759 N.Y.S.2d 734 [2d Dept.2003] ). That established meaning is consistent with industry practice, public policy and DHL's insurance agreement itself.
In Motor Veh. Acc. Indem. Corp., Continental Insurance attempted to deny coverage after an accident on the ground that the driver of a rental car was forbidden, by the terms of the rental agreement, from driving the car. We held that the driver nevertheless drove the car with constructive "permission" of the owner, as that term is used in section 388 of the Vehicle and Traffic Law, overcoming the restrictions on use provided by Continental in the lease. We wrote:
"The restrictions sought to be imposed by Continental violate the public policy of this State.... The ***303 lessor (and Continental) ... knew or should have known that the probabilities of the car coming into the hands of another person were exceedingly great and in these circumstances they are to be charged with constructive consent ... Any other interpretation would be placing an unreasonable *499 **109 limitation on the 'permission' contemplated by [ section 388 ] ... [ Section 388 ] expresses the policy that one injured by the negligent operation of a motor vehicle should have recourse to a financially responsible defendant ...
"To put it another way, these considerations of sound public policy will prevent the evasion of the liability of one leasing cars for profit (and, in turn, his insurer) via the attempted device of restrictions on or conditions of use which run counter to the recognized realities and, in a measure, disguise the transaction" ( 35 N.Y.2d at 264-265, 360 N.Y.S.2d 859, 319 N.E.2d 182 ).
Subsequently, in Murdza, we explained that
"[o]ur finding of constructive consent [in Motor Veh. Acc. Indem. Corp. ]-despite the owner's restrictions-rested, in part, on the public policy concerns surrounding the large number of vehicles placed on the road by businesses that rent cars to others for profit, and the inevitability that these vehicles will 'become involved in their fair share of accidents' " ( 99 N.Y.2d at 380, 756 N.Y.S.2d 505, 786 N.E.2d 440, quoting Motor Veh. Acc. Indem. Corp., 35 N.Y.2d at 263, 360 N.Y.S.2d 859, 319 N.E.2d 182 ).
The Vehicle and Traffic Law's understanding of "permission" is echoed in Insurance Law § 3420(e), which requires an insurer (regardless of location) issuing a policy "covering liability arising from the ownership, maintenance or operation of any motor vehicle" if the vehicle is "principally garaged or principally used in this state" to insure the named insured from any liability "as a result of negligence in the operation or use of such vehicle ... by any person operating or using the same with the permission, express or implied, of the named insured " (emphasis added).
Those same public policy concerns are at issue here. DHL contracted with MVP and others for the operation of fleets of thousands of vehicles with DHL's logos, for the purpose of the exclusive delivery of DHL's packages nationwide, including Western New York. Mr. Carlson pointed to evidence showing ***304 that MVP's trucks were used exclusively for DHL's business. Some of those trucks will inevitably become involved in their fair share of accidents, and some of those accidents will inevitably occur when a driver departs from the specified routes or driving restrictions. The record, though incomplete at this point, indicates that DHL, as the "financially responsible defendant," has procured coverage that is priced and intended to provide excess coverage for those fleets of trucks when driven by an authorized user (see 35 N.Y.2d at 264, 360 N.Y.S.2d 859, 319 N.E.2d 182 ).
Mr. Carlson's expert, who claims 40 years of experience in the insurance industry, opined that, as a matter of common industry usage, "[t]he term 'permission' in an insurance policy is broad and simply means that the operator was legally allowed to use that vehicle at the time of an accident. To put in simpler terms, in an insurance context an operator is either a permissive user or a thief who stole the vehicle" (cf. Murdza, 99 N.Y.2d at 381, 756 N.Y.S.2d 505, 786 N.E.2d 440 ["because the lessee gave his consent to (the third-party driver) to operate the rental vehicle ... we (found) that he was operating it with the constructive consent of (the lessor) and, perforce, with the permission envisioned by the provisions of section 388... Absent the lessee's consent, the third party's operation would have been that of a thief-the antithesis of a permissive user" (internal quotation marks omitted) ] ). That opinion comports with our decisions in Motor Veh. Acc. Indem. Corp. and Murdza, as well as the public policies *500 **110 of the State, because if "permission" could be read to limit coverage for failure to adhere to certain specifications-such as avoiding detours or following the rules of the road-automobile insurance companies could successfully disclaim coverage for almost any accident when the driver is not the owner of the vehicle. That kind of "unreasonable limitation" on coverage was rejected by this Court in Motor Veh. Acc. Indem. Corp. , as it did not comport with the public policy that "one injured by the negligent operation of a motor vehicle should have recourse to a financially responsible defendant" ( 35 N.Y.2d at 264, 360 N.Y.S.2d 859, 319 N.E.2d 182 ).
DHL argues that the interpretation of "permission" is controlled by the Appellate Division's decision in Carlson v. Porter, 53 A.D.3d 1129, 861 N.Y.S.2d 907 (4th Dept.2008). There, the Appellate Division concluded as a matter of law that "neither the DHL defendants nor MVP may be held vicariously liable under the theory of respondeat superior" because Porter was on a personal errand at the time of the accident and that "his employment did not create the necessity for the travel" ( id. at 1132, 861 N.Y.S.2d 907 ). However, the doctrine ***305 of respondeat superior is not relevant to the issue of permission here. The doctrine of respondeat superior is used to determine when an employer may be held responsible for acts of an employee, not when an insurance company must provide coverage under the terms of its own policy.[6]
Under the terms of the insurance contract, coverage is not limited to circumstances where DHL is held directly liable or liable by way of the doctrine of respondeat superior. The contract contemplates coverage in circumstances where the driver may not be an employee, or where the driver may not be acting within the scope of employment, so long as the other requirements for coverage are met.
III.
AAIC adopts the Appellate Division's rationale that because AAIC's policy was issued in New Jersey and delivered in Washington and then in Florida, it was neither issued nor delivered in New York, and therefore plaintiff cannot recover from AAIC pursuant to Insurance Law § 3420. Our decision in Preserver resolves that question, and we now reiterate that section 3420 applies to policies that cover insureds and risks located in the state.
Insurance Law § 3420 allows a limited cause of action on behalf of injured parties directly against insurers. Section 3420 applies to policies and contracts "issued or delivered in this state" (see Insurance Law § 3420 [a] ). Insurance Law § 3420 does not define the term "issued or delivered in this state," but other provisions of the Insurance Law are instructive: "[T]he proper interpretation of the term 'issued or delivered in this state' refers both to a policy issued for delivery in New York, and a policy issued for delivery outside of New York" (Ops. Gen. Counsel N.Y. Ins. Dept. No. 09-06-08). In Preserver, we *501 **111 interpreted section 3420(d), which then required insurers to provide written notice when disclaiming coverage under policies "issued ***306 for delivery" in New York. We held that "[a] policy is 'issued for delivery' in New York if it covers both insureds and risks located in this state" ( 10 N.Y.3d at 642, 862 N.Y.S.2d 820, 893 N.E.2d 97 ). Thus, under Preserver, "issued for delivery" was interpreted to mean where the risk to be insured was located-not where the policy document itself was actually handed over or mailed to the insured. We interpreted section 3420 to provide a benefit-deliberately in derogation of the common law-to New Yorkers whenever a policy covers "insureds and risks located in this state" (id. ).[7] Applying the Preserver standard to the facts of this case, it is clear that DHL is "located in" New York because it has a substantial business presence and creates risks in New York. It is even clearer that DHL purchased liability insurance covering vehicle-related risks arising from vehicles delivering its packages in New York, because its insurance agreements say so.
This interpretation of "issued or delivered" is consistent with the reasoning behind the legislature's enactment of Insurance Law § 3420. In 1917, the legislature created this statutory cause of action to remedy the inequity of the common-law rule that an injured person had no cause of action against the insurer of a tortfeasor and to protect the tort victims of New York (see Lang v. Hanover Ins. Co., 3 N.Y.3d 350, 353-354, 787 N.Y.S.2d 211, 820 N.E.2d 855 [2004] ). "Generally, statutes designed to promote the public good will receive a liberal construction and be expounded in such a mannerthat ***307 they may, as far as possible, attain the end in view" (McKinney's Cons. Laws of N.Y., Book 1, Statutes § 341, Comment). The overall legislative intent of Insurance Law § 3420 is to protect the tort victims of New York State, and the subsequent amendments to section 3420 were designed to expand the remedy, not to contract it.
In 2008, the legislature amended Insurance Law § 3420 to expand its reach in several respects. The 2008 amendments were made to "restore fairness to the process and protect individuals who suffer personal injuries and families whose loved ones have died as a result of the tortious conduct of another" (Letter from John A. DeFrancisco, July 14, 2008, Bill Jacket, L. 2008, ch. 388 at 5; see Senate Introducer's *502 **112 Mem. in Support, Bill Jacket, L. 2008, ch. 388 at 8, 2008 N.Y. Legis. Ann. at 261-262; see also Letter from Helene E. Weinstein, July 16, 2008, Bill Jacket, L. 2008, ch. 388 at 6 ["(T)his progressive, forward thinking legislation will benefit insureds, injured parties, and the administration of justice"]; Letter from Robert Brenna Jr., President, New York State Academy of Trial Lawyers, July 11, 2008, Bill Jacket, L. 2008, ch. 388 at 18 ["This legislation advances the cause of justice and will improve New Yorkers' access to the courts, and their ability to seek relief for injuries and wrongful death"] ).
The 2008 amendments also changed the "issued for delivery" language in subsection (d) to match the "issued or delivered" language elsewhere in the statute. Nothing in the bill jacket or other legislative history mentions that change, so that it appears to have been a stylistic change with no intended import. If anything, "issued or delivered" is facially broader than "issued for delivery." Moreover, there is certainly no indication that the legislature's minor amendment to subsection (d) was intended to overturn this Court's holding in Preserver.
Interpreting "issued or delivered in this state" to apply exclusively to policies issued by an insurer located in New York or by an out-of-state insurer who mails a policy to a New York address would undermine the legislative intent of Insurance Law § 3420. It would require an assumption that the legislature intended to remove coverage benefitting injured New York residents if the policy was mailed from another state, but to increase coverage for foreign victims injured elsewhere so long as the policy was mailed to New York or underwritten by a New York-based insurer-hardly plausible in light of the express purposes of section 3420 and the 2008 amendments.
***308 The dissent suggests that, "[g]iven the sharp change in the meaning of 'issued or delivered,' and the frequency with which that phrase is used," our holding today will "wreak havoc" in unspecified ways (dissenting op. at 322, 67 N.Y.S.3d at 123, 89 N.E.3d at 513).[8] That is not the case. Today's interpretation of "issued or delivered" to include policies that cover both insureds and risks located in the state is not a "sharp change"; that interpretation is consistent with Preserver and the legislative history of section 3420 and the 2008 amendments. The fact that the phrase "issued or delivered" exists in other provisions of the Insurance Law does not affect the analysis, for a few reasons. First, although "issued or delivered" appears in other parts of the Insurance Law, we have yet to interpret the phrase in any of those other contexts. Thus, decrying our interpretation of "issued or delivered" because it might affect the interpretation of those same words in other provisions would apply equally to the adoption of the dissent's view: any interpretation would have that effect.
Second, we do not here purport to judge the meaning of the words "issued or delivered" in any context other than section 3420. Identical words may be used in different contexts with different meanings and different legislative histories, and we do not foreclose any such interpretations by our decision here.
Third, the dissent would restrict section 3420(a) to policies that were either issued in New York or delivered to New York, *503 **113 and would exclude, for example, an insurance policy issued by a national insurer located in Connecticut to a retailer operating in all 50 states, if the policy was delivered to the retailer's headquarters in Arkansas-even if the policy was specifically written to cover risks in New York created by the insured's extensive operations in this state. The same concerns that animate our consideration of section 3420 are also relevant to and consistent with the purpose of other provisions of the Insurance Law, which has as its overriding purpose the protection of New Yorkers and the coverage of injuries occurring in New York (see e.g. Insurance Law § 1213[a] [declaring the legislature's concern that out-of-state insurers present New York residents "the often insuperable obstacle of resorting to ***309 distant forums for the purpose of asserting legal rights under such policies," and therefore providing that any transaction of business or solicitation thereof by a foreign insurer constitutes authorization for the Superintendent of Financial Services to accept process for that insurer] ). The dissent's interpretation of "issued or delivered" would allow an insurer to avoid compliance with many of the provisions of the Insurance Law simply by mailing the policy to the insured's secondary location, even though the risks contemplated by the policy existed entirely within New York. It is simply not plausible that the legislature intended the provisions of the Insurance Law to be so easily evaded by companies doing business in New York and purporting to cover risks in New York.
In light of the above, we conclude that the term "issued or delivered" does not alter our conclusion in Preserver, and that section 3420(a) encompasses situations where both insureds and risks are located in this state. In so holding, we further conclude that the policies here fall within the purview of Insurance Law § 3420, and Mr. Carlson may maintain his Insurance Law § 3420 cause of action against AAIC, subject, of course, to his ability to prove coverage.
IV.
Mr. Carlson's remaining claims are without merit, and we review them briefly.
General Business Law § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade[,] or commerce or the furnishing of any service in [New York] are ... unlawful" ( General Business Law § 349[a] ). We have held that "[s]ection 349 does not grant a private remedy for every improper or illegal business practice, but only for conduct that tends to deceive consumers" ( Schlessinger v. Valspar Corp., 21 N.Y.3d 166, 172, 969 N.Y.S.2d 416, 991 N.E.2d 190 [2013] ). "As a threshold matter, in order to satisfy General Business Law § 349 plaintiffs' claims must be predicated on a deceptive act or practice that is 'consumer oriented' " ( Gaidon v. Guardian Life Ins. Co. of Am., 94 N.Y.2d 330, 344, 704 N.Y.S.2d 177, 725 N.E.2d 598 [1999], quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d 20, 24-25, 623 N.Y.S.2d 529, 647 N.E.2d 741 [1995] ). Mr. Carlson's allegations demonstrate that this action is merely a " 'private' contract dispute over [insurance] policy coverage," which does not "affect[ ] the consuming public at large," and therefore falls outside the purview of General Business Law § 349 ( ***310 New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 321, 639 N.Y.S.2d 283, 662 N.E.2d 763 [1995] ; see Oswego Laborers' Local 214 Pension Fund, 85 N.Y.2d at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 ).
"The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, *504 **114 an intent to induce reliance, justifiable reliance by the plaintiff[,] and damages" ( Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559, 883 N.Y.S.2d 147, 910 N.E.2d 976 [2009] ; see Lama Holding Co. v. Smith Barney, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 [1996] ). In an action for fraud, "the circumstances constituting the wrong shall be stated in detail" ( CPLR 3016[b] ). Here, Mr. Carlson does not allege, with sufficient particularity, details demonstrating that the defendants engaged in any fraud. His allegations concerning defendants' alleged misrepresentations and bad faith refusal to settle the claim are purely conclusory in nature and duplicative of his direct action pursuant to Insurance Law § 3420 and therefore fail to state a cause of action (see New York Univ., 87 N.Y.2d at 320, 639 N.Y.S.2d 283, 662 N.E.2d 763 ). Finally, New York does not recognize a freestanding claim for conspiracy (see Alexander & Alexander of N.Y. v. Fritzen, 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 503 N.E.2d 102 [1986] ["a mere conspiracy to commit a (tort) is never of itself a cause of action"] ). In light of the above, Mr. Carlson's remaining claims were properly dismissed.
Accordingly, the orders of the Appellate Division should be modified, without costs, by denying defendants' motions to dismiss the first cause of action and, as so modified, affirmed.

For example, he asserts that DHL purchased additional coverage for independent contractor vehicles under the hired auto provisions of its business automobile policies and that National Union contemplated the exposure of the so-called independent contractors driving their own vehicles in hauling goods on behalf of DHL in the pricing of the insurance policy and calculated the premiums to cover the MVP vehicles as hired automobiles. Notably, DHL's coverage for the hired automobiles was for amounts in excess of $1 million, where DHL required MVP to carry $1 million coverage.

Because the schedule of hire is missing, the dissent's contention that the agreement is "complete and clear and unambiguous upon its face" is puzzling (dissenting op. at 317, 67 N.Y.S.3d at 119, 89 N.E.3d at 509).

Mr. Carlson pleaded as much:
"[A]t the time of the accident, MVP was delivering goods and hauling freight for DHL pursuant to a Cartage Agreement that was drafted by DHL, and contained a very detailed set of directives through which DHL created a relationship wherein MVP's discretion was all but completely eliminated, and DHL retained virtually complete control with respect to the means and manner by which MVP's services were to be delivered."

The dissent claims that in order to obtain coverage, "plaintiff has the burden of establishing" that the MVP vehicle was hired by DHL and used with DHL's permission (dissenting op. at 313, 67 N.Y.S.3d at 116, 89 N.E.3d at 506). However, we must remain mindful of the procedural posture of this case. A plaintiff opposing a motion to dismiss pursuant to CPLR 3211(a)(1) and (7) does not have the burden of conclusively demonstrating his or her entitlement to recovery.

The Appellate Division's rationale relied on dicta from our decision in Dairylea Coop. v. Rossal, 64 N.Y.2d 1, 9-10, 483 N.Y.S.2d 1001, 473 N.E.2d 251 (1984). Dairylea is inapposite on several counts. First, the policy at issue there specifically excluded from coverage "the owner of a non-owned automobile," and there was "no question that ... the tanker was not owned by Dairylea" (id. ). The policies here contain no such exclusion. Second, the various facts suggesting that DHL could and did exercise substantial control over MVP were not present in Dairylea.

"Under the doctrine of respondeat superior, an employer will be liable for the negligence of an employee committed while the employee is acting in the scope of his employment" (Lundberg v. State of New York, 25 N.Y.2d 467, 470, 306 N.Y.S.2d 947, 255 N.E.2d 177 [1969] ). The doctrine is limited: "An employee acts in the scope of his employment when he is doing something in furtherance of the duties he owes to his employer and where the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities" (id. ). Where travel is part of the employment, "the crucial test is whether the employment created the necessity for the travel" (Swartzlander v. Forms-Rite Bus. Forms & Print. Serv., 174 A.D.2d 971, 972, 572 N.Y.S.2d 537 [4th Dept.1991] ).

Although the dissent claims that the Preserver court "relied on" the distinction between "issued or delivered" and "issued for delivery," the basis for that claim is unsound (dissenting op. at 321, 67 N.Y.S.3d at 121-22, 89 N.E.3d at 511-12). The dissent points out that the Appellate Division in American Ref-Fuel Co. of Hempstead v. Employers Ins. Co. of Wausau, 265 A.D.2d 49, 705 N.Y.S.2d 67 (2d Dept.2000), cited in Preserver, notes that the phrase "issued for delivery" is different from "issued or delivered." However, the court in American Ref-Fuel did only that-noted the distinction-but did not rely on it in making its determination regarding section 3420(d). Indeed, American Ref-Fuel explains that the statute, both as originally enacted using the words "issued or delivered," and as later amended to "issued for delivery," at all times covered "accidents occurring in this State" (265 A.D.2d at 52, 705 N.Y.S.2d 67 ). American Continental Props. v. National Union Fire Ins. Co. of Pittsburgh, 200 A.D.2d 443, 446-447, 608 N.Y.S.2d 807 (1st Dept.1994), which the dissent claims "construed the 'issued or delivered' language as limited to where the policy had been physically signed and executed" (dissenting op. at 321, 67 N.Y.S.3d at 122, 89 N.E.3d at 512), held only that there was a question of fact as to whether the policy was issued or delivered in New York where the policy contained a New York address, was signed in New York, countersigned in Pennsylvania, and "where a substantial portion of the risk associated with the policy" was located in New York. Thus, prior to Preserver, there was no clear distinction between the two phrases in the context of section 3420.

The dissent's questions about the effects of our decision fail to take into account two things: (1) an insurance company will be subject to suit in New York only if a New York court has personal jurisdiction over it; and (2) section 3420 applies to policies that cover both insureds and risks located in New York.