# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 37
Nadkos, Inc.,
  Appellant,
  v.
Preferred Contractors Insurance
Company Risk Retention Group LLC,
  Respondent,
et al.,
  Defendant.

S. Dwight Stephens, for appellant.
Diane Bucci, for respondent.

RIVERA, J.:

On this appeal, we conclude that a general business practice of failing to promptly disclose coverage within the meaning of Insurance Law § 2601 (a) (6) does not include violations of the timely liability disclaimer requirement of Insurance Law § 3420 (d) (2).

- 1 -

The genesis of this appeal is in an insurance coverage dispute between plaintiff Nadkos, Inc., the general contractor in an underlying personal injury action by an employee of Nadkos's subcontractor, and defendant Preferred Contractors Insurance Company Risk Retention Group LLC (PCIC), the subcontractor's general liability insurer. PCIC is a risk retention group (RRG) charted in Montana and doing business in New York. An RRG is an issuer of insurance owned and operated by insureds who work in the same industry and are exposed to similar liability risks (Wadsworth v Allied Professionals Ins. Co., 748 F3d 100, 102 n 1 [2d Cir 2014]; 15 USC § 3901 [a] [4]).

The PCIC policy named Nadkos as an additional insured, extending coverage to Nadkos for liability related to the "ongoing operations" of the subcontractor and other members of the risk retention group. After PCIC disclaimed coverage based on certain exclusions in the policy,[1] Nadkos sought a declaratory judgment that the policy obligated PCIC to defend and indemnify Nadkos in the employee's personal injury action. Nadkos also maintained—without objection from PCIC—that the disclaimer was untimely. Thus, according to Nadkos's interpretation of Insurance Law § 3420 (d) (2), the disclaimer was void.

PCIC moved for summary judgment, arguing that section 3420 (d) (2) is inapplicable to a nondomiciliary RRG. Nadkos then cross-moved for summary judgment,

---

[1] The PCIC policy specifically excluded coverage of bodily injuries to "[a]ny 'employee' of any insured or any contractor or subcontractor working directly or indirectly on any insured's behalf arising out of and in the course of . . . employment by the insured." It also excluded any bodily injuries caused by "the acts or omissions of any independent contractor(s) or subcontractor(s) whether or not hired by the insured."

asserting that Insurance Law § 2601 (a) (6), which undisputedly applies to foreign RRGs, cross-references section 3420 (d) and therefore subjects PCIC to the timely disclaimer requirements of section 3420 (d) (2). As such, PCIC is barred from asserting all coverage defenses as applied to Nadkos. Supreme Court granted PCIC summary judgment dismissing the complaint, denied Nadkos's cross-motion and made a declaration in favor of PCIC.

The Appellate Division affirmed, holding that an insurance coverage disclaimer is not a disclosure of coverage within the meaning of Insurance Law § 2601 (a) (6), and therefore section 3420 (d) (2) does not apply to nondomiciliary PCIC (Nadkos, Inc. v Preferred Contrs. Ins. Co. Risk Retention Group LLC, 162 AD3d 7, 11-12 [1st Dept 2018]). We granted Nadkos leave to appeal (32 NY3d 905 [2018]).[2]

We begin our analysis with the applicable insurance provisions of the state's statutory and regulatory framework.[3] The Legislature promulgated the Risk Retention

---

[2]The Appellate Division also concluded as a threshold matter that, to the extent permitted by the federal Liability Risk Retention Act of 1986, Insurance Law § 5904 (d) governs regulation of nondomiciliary RRGs, like PCIC, and expressly requires compliance with Insurance Law § 2601. Since we hold on state statutory grounds that foreign RRGs are not subject to section 3420 (d) (2) we do not opine on the merits of the parties' federal preemption arguments.

[3]The dissent engenders confusion as to our reasoning (dissenting op at 9-10), which proceeds along straightforward analytic steps grounded in well-established rules of statutory construction: Insurance Law Article 59 applies to RRGs; section 5904 expressly subjects nondomiciliary RRGs, like PCIC, to section 2601 (a) (6); section 2601 (a) (6) cross-references those provisions of section 3420 (d) that concern an RRG's failure to timely disclose coverage, meaning conduct addressed in subparagraph (d) (1), not an RRG's disclaimer of liability, which is subject to the separate requirements found in subparagraph (d) (2).

Groups and Purchasing Groups Act, codified in Article 59 of the Insurance Law, "to regulate the formation and/or operation in this state of risk retention groups" (Insurance Law § 5901). As relevant to this appeal, Insurance Law § 5904 provides that nondomiciliary RRGs doing business in New York "shall comply with the unfair claims settlement practices provisions as set forth in [section 2601] of this chapter, and any regulations promulgated thereunder" (Insurance Law § 5904 [d]).[4]

In turn, Insurance Law § 2601 (a) lists acts by insurers that, "if committed without just cause and performed with such frequency as to indicate a general business practice, shall constitute unfair settlement practices." Insurance Law § 2601 (a) (6) includes, "failing to promptly disclose coverage pursuant to" Insurance Law §§ 3420 (d) or (f) (2) (A) (Insurance Law § 2601 [a] [6]).

Insurance Law § 3420 (d) contains two paragraphs. The first, paragraph (d) (1), requires insurers to respond to requests for information by insureds or injured individuals. Specifically, it mandates that insurers inform the requesting party, within firm statutory deadlines, whether the insured has a particular policy, the coverage limits of that policy, and whether additional information is needed to identify the policy (see Insurance Law § 3420 [d] [1]). The second, paragraph (d) (2), provides that if "an insurer shall disclaim liability or deny coverage . . . it shall give written notice as soon as is reasonably possible"

---

[4] Contrary to the dissent's claim, we do not decide the outer limits of our state's regulation of nondomiciliary RRGs, such as whether nondomiciliary RRGs are subject only to Insurance Law § 5904 (dissenting op at 9-10). That question is not presented by this appeal.

(Insurance Law § 3420 [d] [2]).  Like section 3420 (d) (1), section 3420 (f) (2) (A) requires insurers to inform insureds of the limits of coverage for uninsured/underinsured motorist claims (see Insurance Law § 3420 [f] [2] [A]).

The penalties for violations of the disclosure mandates in sections 3420 (d) (1) and 3420 (f) (2) (A) differ from those imposed for violations of the disclaimer requirements in section 3420 (d) (2).  While an insurer is subject to a monetary penalty for failure to timely disclose in accordance with section 3420 (d) (1) (Insurance Law § 2601 [c]), its failure to timely disclaim liability or deny coverage is considered an unduly delayed notice that results in per se prejudice to the insured and limits the defenses an insurer could raise against an insured's claim (see KeySpan Gas E. Corp. v Munich Reins. Am., Inc., 23 NY3d 583, 590 [2014]).

Whether PCIC's disclaimer is regulated by the Insurance Law turns on whether the reference to an insurer's failure "to promptly disclose coverage" in section 2601 (a) (6) includes the timely disclaimer requirement of section 3420 (d) (2).  Nadkos argues that section 2601 (a) (6) cites to section 3420 (d) without limitation, and thus encompasses both paragraphs (d) (1) and (d) (2).  According to Nadkos, if the Legislature intended to limit section 2601 (a) (6) to a specific subparagraph of section 3420 (d), it knew how to do so, as demonstrated by the cross-reference in section 2601 (a) (6) to a specific subparagraph of another provision—3420 (f) (2) (A).  PCIC responds that section 2601 (a) (6) is intended to impose the disclosure requirements of sections 3420 (d) (1) and 3420 (f) (2) (A).  Section

3420 (d) (2) is distinguishable as it requires insurers to timely disclaim liability or deny coverage.

We reject the interpretation advocated by Nadkos, and adopted by the dissent, because the prohibition on an unfair claim settlement practice based on a failure to promptly disclose coverage encompasses the mandates of section 3420 (d) (1), not (d) (2).[5]

"When presented with a question of statutory interpretation, a court's primary consideration 'is to ascertain and give effect to the intention of the Legislature' " (Matter of Lemma v Nassau County Police Officer Indem. Bd., 31 NY3d 523, 528 [2018], quoting Riley v County of Broome, 95 NY2d 455, 463 [2000]). We have long held that "[t]he statutory text is the clearest indicator of legislative intent" and that a court "should construe unambiguous language to give effect to its plain meaning (Matter of DaimlerChrysler Corp.

_____

[5] Despite the dissent's characterization of this Court's reasoning, we do not "expressly decline[] to consider" a dispositive issue or avoid legal reasoning essential to resolution of this appeal (dissenting op at 4). Nadkos asserts that Insurance Law § 2601 (a) (6) is properly read as making both sections 3420 (d) (1) and (d) (2) unfair claims settlement practices such that a nondomiciliary RRG's required compliance with paragraph (d) (2) is not preempted by the LRRA. Thus, the question presented here turns on the meaning of our state law—either section 2601 (a) (6) refers to section 3420 (d) (2) or it does not. The federal Liability Risk Retention Act ("LRRA") does not shed light on the answer to that specific question. Put another way, we may not avoid deciding whether a violation of section 3420 (d) (2) is an unfair claims settlement practice within the meaning of section 2601 (a) (6). Although it is analytically sound to first determine whether a party's action is subject to a rule (LRRA preemption) before deciding whether an exception applies, we need not do so here. Given the procedural posture of this case, the parties' agreement that the LRRA applies to PCIC and the challenged disclaimer notification, and our interpretation of the relevant Insurance Law sections, we may resolve the appeal solely on state law grounds. Our approach avoids the path taken by the dissent, of possibly misconstruing the LRRA's expansive text and intended purpose with an overly narrow reading of the statute and its legislative history, or by disputing federal decisions to the contrary.

v Spitzer, 7 NY3d 653, 660 [2006]).  "In the absence of a statutory definition, 'we construe words of ordinary import with their usual and commonly understood meaning, and in that connection have regarded dictionary definitions as useful guideposts in determining the meaning of a word or phrase' " (Yaniveth R. v LTD Realty Co., 27 NY3d 186, 192 [2016], quoting Rosner v Metropolitan Prop. & Liab. Ins. Co., 96 NY2d 475, 479-480 [2001]).  It is also our well-established rule that "statutory language should be harmonized, giving effect to each component and avoiding a construction that treats a word or phrase as superfluous" (Lemma, 31 NY3d at 528).

The text of Insurance Law § 2601 (a) (6) plainly qualifies its reference to Insurance Law § 3420, limiting it to an insurer's failure "to promptly disclose coverage pursuant to" sections 3420 (d) and (f) (2) (A).  In other words, section 2601 (a) (6) applies solely to those portions of subsections 3420 (d) and (f) that require a prompt disclosure of coverage-specific information.  The term "disclose" is not defined in the Insurance Law, nor is it mentioned in sections 2601 and 3420 (d), but that does not render, as the dissent maintains (dissenting op at 17-20), these two sections ambiguous or their interplay unclear.

The term "disclose" generally means "[t]o make (something) known or public; to show (something) after a period of inaccessibility or of being unknown; to reveal" (Black's Law Dictionary [10th ed 2014], disclose).  To "disclaim," on the other hand, is "[t]o state, usually formally, that one has no responsibility for, knowledge of, or involvement with (something); to make a disclaimer about . . . [t]o renounce or disavow a legal claim to"

(Black's Law Dictionary [10th ed 2014], disclaim).[6] Section 3420 (d) (1) is comprised of three subparagraphs that outline an insurer's requirement to disclose coverage information upon request. Section 3420 (d) (1) (A) provides that the subsequent subparagraphs apply only to certain policies (Insurance Law § 3420 [d] [1] [A]).[7] In turn, subparagraph (B) requires an insurer to confirm the existence and limits of coverage for an applicable policy, when such information is requested by an injured person or claimant (Insurance Law § 3420 [d] [1] [B]). In furtherance of this goal to reveal an existing policy's coverage, subparagraph (C) requires the insurer to request additional information from the injured person, or claimant, if necessary to identify an applicable policy (Insurance Law § 3420

---

[6] The dissent contends that "disclose" and "disclaim" are "words of technical or special meaning," i.e., terms of art, and thus should not be given their ordinary meaning (dissenting op at 19 n 7, citing McKinney's Cons Laws of NY, Book 1, Statutes § 233). That prescription has limited application and is not universally deployed in service of the ultimate judicial task of determining legislative purpose. The commentary to the authority upon which the dissent relies clarifies that the "intent of the Legislature however, is the controlling consideration in the construction of statutes; and when necessary to effectuate such intent the courts may construe words of technical meaning according to their popular sense" (McKinney's Cons Laws of NY, Book 1, Statutes § 233, Commentary). Thus, our reliance on dictionary definitions here is fully in accord with established canons of construction.

The dissent's view that we place undue emphasis (dissenting op at 18) on analyzing textual differences ignores this Court's role when called upon to interpret a statute. Our task is to dig into the weeds, parse minute details, and consider whether a legislative choice of a specific word or phrase evinces a particular intent. In view of the text and structural placement of the subject provisions, as well as the legislative history, discussed infra, Insurance Law § 2601 (a) (6) is properly read as distinguishing denials of coverage from the disclosure of coverage, as those terms are commonly understood.

[7] The applicable policies must provide coverage for claims "arising out of the death or bodily injury of any person," and constitute "automobile insurance" or "personal lines insurance" as defined in Insurance Law § 3425, or "used to satisfy a financial responsibility requirement imposed by law or regulation" (Insurance Law § 3420 [d] [1] [A]).

[d] [1] [C]).  By requiring insurers to confirm the existence of an applicable liability policy

and to specify the limits of its coverage, the requirement in section 3420 (d) (1) falls within

the general meaning of a disclosure.  Conversely, an insurer does not disclose coverage by

merely notifying the insured that it is not liable or will not provide coverage—a notification

required by section 3420 (d) (2).[8]

The dissent's embellished version of Nadkos's claim is as unpersuasive as the

original (dissenting op at 17-20).  To disclose coverage is to make known the existence of

a policy, which once disclosed may lead to litigation regarding whether the insured or other

claimant is entitled to a payout under the terms of the policy.  Indeed, Insurance Law

§§ 3420 (d) (1) (B) and (C) respectively impose 60 and 45-day deadlines for notification,

which promotes expeditious resolution of potential claims.  While it is also useful for the

insured and other claimant to know "as soon as reasonably possible" whether the insurer

will disclaim liability or deny coverage in accordance with (d) (2), the dissent is incorrect

that there is no benefit to the claimant from timely notice under (d) (1) that the insurer has

"identif[ied] a liability insurance policy that may be relevant to the claim" (Insurance Law

§ 3420 [d] [1] [C]).

Indeed, if the Legislature intended Nadkos's interpretation as adopted by the dissent,

it would have used simpler, more direct language of this alleged more expansive

construction.  For example, the drafters could have described this type of unfair claim

---

[8] Given our conclusion that section 3420 (d) (2) does not apply to PCIC, we have no occasion to consider its alternative ground to affirm the Appellate Division's decision, which, in any event, is unpreserved.

settlement practice in either of the following ways: "failing to promptly notify the insured pursuant to section 3420 (d) and section 3420 (f) (2) (A)," or "violating section 3420 (d) and section 3420 (f) (2) (A)."[9]

The statutory structure also supports interpreting the confirmation requirements of section 3420 (d) (1) as distinct from the timely disclaimer of liability and denial of coverage mandated in section 3420 (d) (2). First, as the Appellate Division observed, if section 2601 (a) (6) both encompasses the disclosure requirement of paragraph (d) (1) and disclaimer requirement of (d) (2), then the use of the term "disclosure" in section 2601 (a) (6) would be superfluous. Such an interpretation violates the rule of construction that "words must be "harmonize[d]" and read together to avoid surplusage" (Andryeyeva v New York Health Care, Inc., —NY3d—, —, 2019 WL 1333030 at *8 [2019]; Kimmel v State, 29 NY3d 386, 393 [2017] ["a statute should be construed to avoid rendering any of its provisions

---

[9] Contrary to the dissent's assertions, we do no more than interpret the Insurance Law as written and as required under our rules of statutory construction. Far from unsettling our state's insurance law (dissenting op at 4), or ignoring the statutory text (id.), our analysis conforms to well-established interpretive standards familiar to the parties and the insurance industry generally. We may not ignore those standards in response to the dissent's disapproval of the legislative choice not to include section 3420 (d) (2) within the prohibitions of section 2601 (a) (6). Though the dissent refers to a national consensus about the fairest way to address insurer misconduct, this is a consideration for the Legislature—the body constitutionally charged with weighing policy responses to societal problems. Notwithstanding the invitation by the dissent, we cannot read a statute to reflect a meaning other than what the text permits simply because of a judicial preference for a different policy choice (see Montgomery v Daniels, 38 NY2d 41, 53 [1975] ["The judiciary, however, is not called on to weigh the relative worth of data or arguments which may be marshaled on either side as to the wisdom of determinations made by the Legislature in the realm of policy"]).

superfluous"]). Second, the cross-reference to section 3420 (f) (2) (A), which in turn addresses disclosures of supplemental uninsured/underinsured motorists insurance coverage limits, supports our reading that section 2601 (a) (6) refers only to an insurer's divulgence of the existence and limits of a specified policy—required in paragraph (d) (1)—and not to a blanket statement disclaiming liability or denying coverage—mandated by paragraph (d) (2). Therefore, we reject the invitation of Nadkos and the dissent to ignore the simple fact that the cross-reference in section 2601 (a) (6) is limited to those parts of sections 3420 (d) and 3420 (f) (2) (A) violated by an insurer's repeated "fail[ure] to promptly disclose coverage."[10]

Although the text and structure of these sections render it unnecessary to consider the legislative history, here it lends further support to our construction (see Kimmel, 29 NY3d at 397, quoting Matter of Tompkins County Support Collection Unit v Chamberlin, 99 NY2d 328, 335 [2003] ["the legislative history of an enactment may also be relevant and is not to be ignored"]). The disclosure requirements in section 3420 (d) (1) were enacted as part of amendments made to the Insurance Law in 2008. Prior to the 2008 amendments, section 3420 (d) included only the timely disclaimer requirement now set forth in section 3420 (d) (2) (see Insurance Law § 3420 [d] [2002]). At the time, Insurance

---

[10] The dissent asserts challenges to arguments nowhere found in our statutory analysis of state law, leading the dissent to explain its position on federal law, common law and legislative and judicial adherence to the insurance industry's preferred standards (dissenting op at 11-14, 21-35). However, there is no occasion to consider these issues. We limit ourselves, as we must, to resolving those questions presented by the parties and the underlying matters necessarily implicated by the facts and posture of this appeal.

Law § 2601 (a) (6) referred solely to section 3420 (f) (2) (A) (see Insurance Law § 2601 [a] [6] [1998]). Only after section 3420 (d) (1) was added in 2008 was section 2601 (a) (6) amended to cross-reference section 3420 (d). The inescapable inference is that the Legislature did not consider violations of section 3420 (d) (2) to be an unfair claim settlement practice when it amended section 2601.

The purposes of the 2008 amendments support this reading. The changes in the law were intended to permit individuals suing an insured tortfeasor to initiate a simultaneous declaratory judgment action against the tortfeasor's insurer to challenge the denial of coverage based on late notice, and prohibit insurers from denying coverage based on the failure to provide timely notice without demonstrating they were prejudiced by the delay (see Introducer's Memorandum, L. 2008 ch 388). As the introducer's memorandum states, section 3420 (d) (1) was intended to

> "establish a process for a claimant to receive confirmation from an insurer that the insured had an insurance policy in effect on the alleged occurrence date, and the limits of such policy. This section of the bill also establishes a process in case insufficient information is provided to the insurer and such confirmation is not possible" (id.).

While section 3420 (d) (1) furthered the purposes of the 2008 amendments by creating a process that would allow injured claimants to obtain sufficient information to seek

declaratory relief, it is not evident how, as Nadkos and the dissent argue, paragraph (d) (2) was essential to furthering those objectives.[11]

The statutory text, framework and legislative history establish that section 2601 (a) (6) does not encompass the liability disclaimer requirement of section 3420 (d) (2).[12] Accordingly, the order of the Appellate Division should be affirmed, with costs.

---

[11] The dissent's remaining argument about the applicability of the New York Insurance Department's regulations to this dispute (dissenting op at 21-22) was not raised by Nadkos and as such is not properly before us on this appeal (Merrill by Merrill v Albany Medical Center Hosp., 71 NY2d 990, 991 [1988] [noting this Court may not address issues not raised in the lower court proceedings]).

[12] We express no opinion as to whether the Legislature could amend section 2601 (a) (6) to make repeated failure to promptly disclaim coverage pursuant to section 3420 (d) (2) an unfair claims settlement practice.

Nadkos, Inc. v. Preferred Contractors Insurance Company Risk Retention Group LLC

No. 37

WILSON, J. (dissenting):

Imagine that you have purchased liability insurance, to protect you in case someone sues you for injuries allegedly caused by your negligence. When sued, you ask your insurance company the same question every policyholder asks: am I covered? New York's

legislature has deemed it vitally important that your insurer answer that question right away. Insurance Law § 3420(d)(2) includes the following "untimely disclaimer" rule:

> If under a liability policy issued or delivered in this state, an insurer shall disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state, it shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured and the injured person or any other claimant.

Thus, when you ask your insurer whether you are covered, your insurer must answer you promptly in writing, yes or no. If your insurer does not answer "as soon as is reasonably possible," your insurer is stripped of most of the coverage exclusion clauses in the insurance policy that could otherwise have allowed it to deny you coverage (First Fin. Ins. Co. v Jetco Contr. Corp., 1 NY3d 64, 68 [2003], accord Allstate Ins. Co. v Gross, 27 NY2d 263, 270 [1970]).

New York's untimely disclaimer rule exists to promote fairness to policyholders and accident victims alike. Ordinary people cannot find out whether they are covered by their insurance policies without their insurer's help, because most insurance policies are incomprehensible to nonlawyers (and some, even to lawyers). If policyholders do not know whether their insurer will provide coverage, they cannot know whether they must find their own lawyer, how much they can pay that lawyer, or how much they can offer to settle a threatened or pending lawsuit. Victims of accidents are also stuck, because the policyholder's entire response to a lawsuit—including whether anything beyond the assets

of the defendant is available to satisfy a judgment and what lawyer will defend the suit—depends on whether the policyholder is covered.[1]

Because insurer prevarication is unfair to both victims and policyholders, almost every jurisdiction in the United States provides by statute that an insurance company's regular failure promptly to affirm or deny coverage is an "unfair claims settlement practice." I say "almost" because now New York is no longer among them. Today, the majority pulls New York out of the mainstream, and declares that contrary to the national consensus, common sense and the plain text of our insurance laws, the legislature intended to make an insurer's refusal to confirm or deny coverage promptly not an unfair claims practice, all by adopting an amendment the text of which did exactly that.

Accordingly, every insurer operating in this State, foreign and domestic, risk retention group and multi-line casualty insurer, from Lloyds of London to the smallest captive local insurer, will not be liable for extra-contractual damages for unfair claims handling and/or bad faith practices because of late disclaimer, and damages for late disclaimer will be limited to policy limits—in New York and no other state. That anomalous result rests on the majority's conclusion that when the legislature said "subsection (d)" it did not mean "subsection (d)." The majority reaches that conclusion by misreading the surrounding words based on a flimsy legislative history—causing it to

---

[1] Tom Baker & Kyle Logue, *Insurance Law and Policy: Cases and Materials* at 563-71 (2014) (summarizing scholarship examining how tort claims are shaped to match the available liability insurance).

undermine a 2008 law whose very purpose was to eliminate judicially-imposed pro-insurer spin on New York insurance laws.

Further, the majority's decision unsettles New York's insurance law. Even if an insurer's persistent failure timely to confirm or deny coverage is not an unfair claims practice, Insurance Law § 3420(d)(2) applies to every "liability policy issued or delivered in this state." The policy in this case is a "liability policy . . . delivered in this state." It is also uncontested—at least for our purposes—that the insurance company, PCIC, did not deny coverage to Nadkos within a reasonable time. Therefore, PCIC cannot rely on a policy exclusion to deny Nadkos coverage.

This case should end there. However, the majority ignores the statutory text and declares that Insurance Law § 3420(d)(2) does not apply to foreign risk retention groups. The parties' principal dispute on this appeal is that the above result is required by a federal law, the Liability Risk Retention Act ("LRRA"), which exempts foreign-chartered risk retention groups from state laws that "make unlawful, or regulate, directly or indirectly, the operation of [such] risk retention groups" like PCIC (15 USC § 3902[a]). The majority expressly declines to consider this argument (majority op at 6 n 5) and instead finds that Insurance Law § 3420(d)(2) does not apply here because the phrase "liability policy issued or delivered in this state" (Insurance Law § 3420[d][2]) means only "liability policies issued or delivered by insurers other than foreign RRGs." Section 3420(d)(2) by its terms applies to all liability insurers operating in this state. To conclude that all insurers means all insurers other than foreign RRGs, the majority turns to Article 59's list of state laws

applicable to foreign RRGs, even though that list does not exempt foreign RRGs from any other state insurance laws, does not purport to be an exclusive list of New York insurance laws applicable to RRGs, and could not reasonably be interpreted as such. The majority's refusal to address how to determine what New York insurance laws other than those in Article 59's list apply to RRGs threatens to undermine New York's ability to protect policyholders and victims and seriously undermines New York's status as the nation's premiere insurance law jurisdiction—all because the majority admittedly avoids the federal issue presented by the parties and relied on by the Appellate Division.

**I**

I agree with the majority's recitation of the relevant facts, and briefly summarize them here to place them in the proper context by taking into account the LRRA. Partners LLC, a property developer, hired Nadkos, Inc. as a general contractor to construct a building in Brooklyn. Nadkos hired Chesakl Enterprises Inc. as a subcontractor to perform steelwork. As is common in the construction industry, Nadkos' contract with Chesakl required Chesakl to maintain general liability insurance naming Partners LLC and Nadkos as additional insureds. Chesakl became a member of PCIC, a "risk retention group" of other construction subcontractors, and in that capacity bought from PCIC a general liability insurance policy.

A risk retention group ("RRG") is a liability insurance company owned solely by its insureds. RRGs offer commercial liability insurance for the mutual benefit of those owner-insureds, as a form of collective self-insurance. They make up a relatively small

fraction of the liability insurance market overall, and are largely employed in industries with specialized risks that are not well-addressed by conventional liability insurers. The most common kind of RRG is formed by medical practitioners to provide medical malpractice liability insurance (see generally Government Accountability Office, *Report No. 12-16: Risk Retention Groups* [December 2011], https://www.gao.gov/products/GAO-12-16).  RRGs are strictly "self-insurance" groups, however; they are forbidden from insuring non-members (15 USC § 3901[a][4][G]; Insurance Law § 5902[n][7]).

RRGs are governed by a different regulatory structure than applies to other kinds of insurance providers. Ordinarily, each state regulates all insurers—both those chartered inside and out of the state—in the same way. The LRRA[2] provides, however, that self-insurance groups meeting the federal criteria for being an RRG can, essentially, pick any state in the U.S. to be their home or "chartering" state and be subject to comprehensive regulation by that state only (here, PCIC chose Montana as its chartering state). Congress exempted RRGs from certain insurance regulations issued by non-chartering states, in response to concerns that such regulations would make it impracticable for RRGs to

---

[2] The LRRA began its life as the Products Liability Risk Reduction Act of 1981, or PLRRA (PL 97-45, 95 Stat 949); at that time the regulatory regime was limited to self-insurance groups that covered risks connected to products liability. Congress amended the PLRRA in 1986 to drop the "P", permitting the risk retention group structure established in the PLRRA to be used for any kinds of risks for which one would purchase liability insurance (Risk Retentions Amendments of 1986, PL 99-563, 100 Stat 3170). To avoid confusion, I refer to the federal law from its inception to the present day as the LRRA.

operate across state lines.[3] However, Congress then made an exception to that exemption, allowing states to impose certain categories of regulations on foreign RRGs. Most relevant here, Congress provided that "any State may require [a foreign RRG] to comply with the unfair claims settlement practices law of the State" (15 USC § 3902[a][1][A]).

Although PCIC included Nadkos as an additional insured, PCIC's liability policy contains many exclusions from personal injury coverage, among them an exclusion for claims arising from bodily injury incurred on "employees . . . working directly or indirectly on the insureds behalf." Mirkamel Vafaev, a Chesakl employee, was injured and sued Chesakl, Nadkos, Partners LLC, and Nadkos's principal, Oleksander Nad, for negligence. Chesakl and Nadkos tendered the claim to PCIC on August 27, 2015. PCIC timely disclaimed Chesakl's coverage five days later (counting the weekend), on September 1, 2015. However, it waited a full 81 days before responding to Nadkos, disclaiming coverage on the same basis as it disclaimed to Chesakl (the two letters are almost identical), on November 16, 2015.

Under Insurance Law § 3420(d)(2), an unexcused delay of 48 days or more in disclaiming coverage is unreasonable as a matter of law (First Fin. Ins. Co. v Jetco Contr.

---

[3] The House Report on the original 1981 PLRRA described these obstructive laws in some detail: state laws barring self-insurance groups unless incumbent insurance companies categorically and uniformly refused to provide coverage; state laws authorizing captive insurance companies only if the captive had prohibitively high capital and surplus reserves; onerous minimum premium requirements for captives and burdensome in-state registration requirements (HR Rept 97-190 at 5-6). Conspicuously absent from that list were state laws regarding notifications of acceptance or denial of coverage or claims settlement practices more generally.

Corp., 1 NY3d 64, 68 [2003]), and such a delay "precludes effective disclaimer or denial" of coverage (Hartford Ins. Co. v Nassau County, 46 NY2d 1028, 1029 [1979]). However, PCIC argued that even if its disclaimer was untimely, the LRRA preempted Insurance Law § 3420(d)(2) as applied to it because it was an RRG. PCIC's preemption argument depended on the further conclusion that New York's untimely disclaimer rules are not part of the "unfair claims settlement practices law of the State," which are expressly exempt from preemption (15 USC § 3902[a][1][A]). The courts below held that the LRRA preempted Insurance Law § 3420(d)(2) as applied to PCIC, and we granted leave.

## II

I begin with the question actually presented by this case: does Insurance Law § 3420(d)(2)—the untimely disclaimer rule—apply to liability insurance policies issued by RRGs? The majority jumps to the separate question of whether violating Insurance Law § 3420(d)(2) is an unfair claims practice (majority op at 1), but that question is irrelevant if Insurance Law § 3420(d)(2) applies to RRGs on its own terms.

It does. Insurance Law § 3420(d)(2) applies to every "liability policy issued or delivered in this state." Note the disjunctive "or delivered," which indicates that out-of-state insurance companies (those who "issue" the policies elsewhere) are subject to Insurance Law § 3420(d)(2) even if they merely "deliver" the policy "in this state," as we held just last year (see Carlson v American Intern. Group, Inc., 30 NY3d 288, 305 [2017]). All agree PCIC is an "insurer" and the policy in question is a "liability policy . . . delivered

in this state." Accordingly, Insurance Law § 3420(d)(2) applies to PCIC and to every insurer issuing or delivering insurance policies in New York.

The majority has no answer to the plain text of Insurance Law § 3420(d)(2), which applies to RRGs on its own terms quite apart from its inclusion or non-inclusion as an unfair claims practice on the Insurance Law § 2601(a)(6) list (cf. majority op at 10 n 9). The Appellate Division had an answer: because PCIC is an RRG chartered in another state, the LRRA (15 USC § 3902[a][1]) exempts it from Insurance Law § 3420(d)(2) even though non-RRGs must comply with that statute (162 AD3d 7, 12). I do not agree, as I explain later, but I acknowledge that the Appellate Division rested its holding on a ground that the majority ignores (majority op at 6 n 5). By affirming without explaining whether the Appellate Division's preemption holding is right or wrong, the majority assumes away the plain language of Insurance Law § 3420(d)(2), as well as the federal law that until now all parties and courts agreed was determinative of the ultimate outcome, creating a chasm of uncertainty for RRGs, their policyholders and tort victims.

The majority chooses to avoid comment on the LRRA (majority op at 6 n 5) describing its decision as resting "solely on state law grounds" (id.). In another footnote, it appears to set out what those state law grounds are: declaring the matter "straightforward," it begins by explaining that "Insurance Law Article 59 applies to [foreign] RRGs" (majority op at 3 n 3). Presumably, the majority's point is this: section 5904 contains a list of substantive provisions with which foreign RRGs must comply, whereas section 5903(a) provides that New York-chartered RRGs must comply with "all of the laws, regulations

and orders applicable to property/casualty insurers organized and licensed in this state." The majority's rationale, though not made explicit, must be that as a matter of state law all other insurance laws, including Insurance Law § 3420(d)(2), do not apply to foreign RRGs unless those laws are listed in section 5904.[4] That reasoning at least explains the majority's affirmance "solely on state law grounds" (majority op at 6 n 5). For at least two reasons, however, it cannot be the case that the list in section 5904 exempts foreign RRGs from all state insurance laws not on that list.

First, the conclusion that RRGs are exempt as a matter of state law from all state laws particularly regulating liability insurance except those on the Insurance Law § 5904 list creates tremendous uncertainty as to the applicability of a great many laws and regulations concerning liability insurance not on that list. That uncertainty is compounded by the majority's express reservation of this question in a footnote (majority op at 4 n 4). If Insurance Law § 5904 (or perhaps some other part of Article 59 not mentioned by the majority) exempts foreign RRGs from the otherwise-applicable Insurance Law §

---

[4] The LRRA does not exempt RRGs from state laws "generally applicable to persons or corporations" (15 USC § 3902[a][4]), and I do not understand the majority to hold that the legislature has done what Congress did not. Indeed, that the legislature intended to target only liability insurance regulation is evidenced by L 1990 Ch 198 § 6, which inserted the word "liability" next to the word "insurance" throughout "because that is the only kind of insurance permissible under the LRRA" (Insurance Department Mem, Bill Jacket, L 1990, ch 198 at 13). Accordingly, the only state laws I understand the majority to hold that foreign RRGs are exempt from are those laws applicable *only* "to property/casualty insurers organized and licensed in this state" (Insurance Law § 5903; cf. Monarch Consulting, Inc. v Natl. Union Fire Ins. Co. of Pittsburgh, PA, 26 NY3d 659, 670 [2016] [collecting cases discussing the definition of the "business of insurance"]).

3420(d)(2), but does not exempt them from laws on the Insurance Law § 5904 list, it is hard to think of a principled reason why any liability insurance laws not on that list would apply to foreign RRGs.

The list of laws the majority implies no longer bind RRGs (or might no longer bind RRGs) is long indeed: the laws of New York include entirety of the common law, which was omitted from the list in Insurance Law § 5904 along with almost every other title in the New York statute book beyond select parts of the Insurance Law and the Penal Law. "[T]here is no federal general common law" (Erie R. Co. v Tompkins, 304 US 64, 69 [1938]); there is only the common law of each state, and as of today there is no common law in New York—by decree of the legislature, the majority would have us believe—that applies to RRGs. RRGs should not celebrate our decision today too merrily, because the majority's reasoning excuses them not only from certain New York laws that constrain them, like Insurance Law § 3420(d)(2), but also from many New York legal doctrines that may benefit them. Pity RRGs that benefit from, say, our rejection of the unavailability exception to pro rata allocation in Keyspan Gas E. Corp. v Munich Reins. Am., Inc. (31 NY3d 51, 56 [2018]); from here on out, all of New York's substantive law is closed to them unless itemized in Insurance Law § 5904. That cannot be what the legislature intended when it enacted Article 59.

The facts of this case are useful to illustrate the confusion that will result from the majority's decision. The majority holds that Insurance Law § 3420(d)(2) does not apply to PCIC's coverage of Nadkos. What rules do apply to that coverage? Certainly not common

law doctrines of waiver and estoppel (see Restatement of Liability Insurance §§ 5, 6), which would otherwise drop in to fill the absence of Insurance Law § 3420(d)(2) (cf. KeySpan Gas E. Corp. v Munich Reins. Am., Inc., 23 NY3d 583, 590 [2014]); nonetheless, neither are on the Insurance Law § 5904 list. The result, it seems to me, is that a New York insured has recourse under the policy solely under the laws of the chartering state for any matter not covered by the Article 59. Worse, if the chartering state's courts lacked jurisdiction over wholly out-of-state insurance claims disputes, foreign RRGs may be subject to no regulation at all. It is highly unlikely that the New York legislature intended to outsource regulation of an important part of our state's insurance industry to Montana.

Second, the majority never explains why the implication in Insurance Law § 5904 that foreign RRGs be exempt from liability insurance rules other than those listed in that § 5904 defeats the express inclusion of all liability insurance policies, no matter who issues them, in the plain text of Insurance Law § 3420(d)(2). As the majority says, "statutory language should be harmonized, giving effect to each component and avoiding a construction that treats a word or phrase as superfluous" (Lemma, 31 NY3d at 528; majority op at 7). Here, the absence of any express provision in Insurance Law § 5904 that RRGs are affirmatively exempt as a matter of state law from all state liability insurance laws not in its list, and the presence of an affirmative inclusion of all liability insurance policies in the plain text of Insurance Law § 3420(d)(2), suggests that the two laws are not in conflict: the legislature wanted to bind foreign RRGs to the RRG-specific rules of Insurance Law § 5904 and also to any other law that generally applied to all insurers or all

liability insurance policies delivered in the state (see generally Carlson, 30 NY3d at 305). If the LRRA served to exempt foreign RRGs from certain of those general laws, that would be another matter, but in its absence (as the majority sees it) there is no reason to interpret state law as applying to anything less than what it says.

That the legislature intended to bind foreign RRGs right to the very limits of federal law is further supported by the legislature's own words at the start of Article 59: "The purpose of this article is to regulate the formation and/or operation in this state of risk retention groups and purchasing groups formed pursuant to the provisions of the federal Liability Risk Retention Act of 1986, *to the extent permitted by such law*" (Insurance Law § 5901). This is not the state's long-arm statute, where there is at least some evidence that the legislature wanted to limit state court long-arm jurisdiction to an area well short of the federal allowance (see generally Williams v Beemiller, Inc., 2019 NY Slip Op 03656 [Ct App May 9, 2019] [Feinman, J., concurring]). Here, the state wanted to regulate to the federal maximum: Insurance Law § 5901 says Article 59 applies state law to the RRGs right up to the Congressionally-defined maximum. Accordingly, as a matter of state law, Insurance Law § 3420(d)(2) applies to RRGs if the LRRA would permit the state to impose it on RRGs. Indeed, this is almost certainly why the lower courts and parties focused their analyses and arguments on whether the LRRA preempted New York law—because if it did not, New York clearly stated its intention to subject foreign RRGs to all the provisions of New York law applicable to other insurers.

Finally, the majority's tacit holding that the list contained in Insurance Law § 5904 operates to remove foreign RRGs from section 3420(d)(2)—necessary to its conclusion that the Appellate Division should be affirmed "solely on state law grounds" (majority op at 6 n 5)—is not an argument PCIC ever directly advanced. PCIC cited to Article 59 on precisely three pages of its 60-page brief in this Court, each time solely to support the claim that federal and not state law exempts it from Insurance Law § 3420(d)(2). Nadkos, for its part, mentions Article 59 twice, also in the federal context. Article 59 was not mentioned at oral argument. Whatever prudential reasons may support the majority's decision not to consider the LRRA's application to Insurance Law § 3420(d)(2), it is not correct to describe its decision to rest solely on Article 59 as "limit[ing] ourselves, as we must, to resolving those questions presented by the parties" (majority op at 11 n 10).

## III

Even if foreign RRGs were subject to only those New York liability insurance laws listed in Insurance Law § 5904, Insurance Law § 3420(d)(2) is on that list. As the majority explains, Insurance Law § 5904 provides that foreign RRGs doing business in New York "shall comply with the unfair claims settlement practices provisions as set forth in [section 2601] of this chapter, and any regulations promulgated thereunder" (Insurance Law § 5904 [d]). Insurance Law § 2601 (a) lists acts by insurers that, "if committed without just cause and performed with such frequency as to indicate a general business practice, shall constitute unfair settlement practices." Insurance Law § 2601 (a) (6) includes as such an act "failing to promptly disclose coverage pursuant to subsection (d) or subparagraph (A)

of paragraph two of subsection (f) of section 3420 of this chapter." Insurance Law § 3420(d)(2) is, of course, a part of Insurance Law § 3420(d).

The plain text of the statute makes it clear that the untimely disclaimer rule is an unfair claims settlement practice. When the legislature said "subsection (d)" it meant "subsection (d)," that is, both subsection (d)(1) and (d)(2). The legislature surely knew how to separate out paragraphs in a section—it did so in the very part of the statute at issue here, expressly including "subparagraph (A) of paragraph two of subsection (f)." It is hardly worth counting the number of times this Court has said that "[t]he statutory text is the clearest indicator of legislative intent and that a court should construe unambiguous language to give effect to its plain meaning," (majority op at 6-7 [collecting cases]) or words to that effect. To avoid the obvious textual conclusion and our settled doctrine, the majority engages in multiple acts of interpretative gymnastics.

## A

The majority holds that Insurance Law § 2601(a)(6) encompasses only subsection (d)(1) and not (d)(2) because the text of section 2601(a)(6) applies only to insurers who "fail[] to promptly disclose coverage pursuant to subsection (d)" of Insurance Law § 3420. "By its terms, section 2601 (a) (6) applies solely to those portions of subsections 3420 (d) and (f) that require a prompt disclosure of coverage-specific information" (majority op at 7). Because 3420(d)(1) involves revealing to policyholders and victims the existence of a "policy" covering bodily injury and the maximum limits under that policy, and Insurance Law § 3420(d)(2) involves "disclaiming" coverage, and because "an insurer does not

disclose coverage by merely notifying the insured that it is not liable or will not provide coverage," the majority holds that Insurance Law § 3420(d)(2) falls outside of the section 2601(a)(6) language (majority op at 9).

Instead, the majority argues, section 2601(a)(6) includes only section 3420(d)(1), which essentially requires an insurer promptly to tell a policyholder or victim only two things: whether the policyholder has a policy that matches one of a list of policy types described elsewhere in the Insurance Law (Insurance Law § 3425), and what the coverage limit on that policy is. What (d)(1) does not require, however, is that the insurer state whether it will or will not cover the claim. The insurer need only disclose the mere existence of a policy, and dollar value of the maximum amount that could be paid if the policy actually covers the claim, within the specified time frame to satisfy (d)(1).

To understand the problem with the majority's analysis, consider the following example. When I return from work, my daughter asks if I have brought home any cookies. I confirm that I have brought home a dozen chocolate chip cookies. Any parent knows exactly what question comes next: "can I *have* a cookie?" To that, I say "I'll get back to you in 81 days."

The inevitable reaction of my daughter to my 81-day answer illustrates the problem with the majority's analysis. It is completely irrelevant to her whether the cookies exist; what matters is whether she can eat one. Likewise, an insurer who tells a policyholder (or a victim suing a policyholder) that a policy exists, with a maximum coverage limit, provides no material help to either the policyholder or the victim until the insurer discloses

whether the insurer will cover the claim, and that can only happen if the insurer is discloses whether it denies or accepts coverage. It does little if any good for policyholders or victims to simply be told that a policy exists; indeed, insureds have a copy of their insurance policies when they obtain them, and would not ordinarily know what insurer to notify unless they have some basis to know the identity of their insurer. The problem is that policies are unreadable by all but a subset of lawyers, most of whom work for insurance companies.[5] What Insurance Law § 3420(d)(2) demands is an answer to "am I covered?" That answer is a "disclosure" of insurance coverage. To read it as the majority does is to render it meaningless.[6]

The majority's focus on the verb "disclose" also fails as a matter of textual analysis, because it reads the conjoined word "coverage" out of the statute. I accept the majority's dictionary fortifications around the word "disclose;" they are irrelevant. What matters is whether (d)(1), standing alone, entails a disclosure of "coverage." "Coverage" is defined, in the insurance context, as "inclusion of a risk under an insurance policy; the risks within

---

[5] John Aloysius Cogan, Jr., *Readability, Contracts of Recurring Use, and the Problem of Ex Post Judicial Governance of Health Insurance Policies*, 94 Roger Williams U L Rev 93, 102-103 (2010) ("One of the defining characteristics of contracts of adhesion, and insurance contracts in particular, is that they are unreadable. There appears to be total consensus on this point. Law professors, treatises, commentators and the Restatement (Second) of Contracts all concede that people do not read their insurance contracts due in large part to the complexity of the contracts." [citations omitted])

[6] It is no answer to say that interpreting "disclose" in § 2601(a)(6) to encompass all of the subsections it describes renders that word superfluous; once subsection (d) is understood in its totality as a disclosure requirement, it makes perfect sense for the statute (which grammatically calls for a verb) to use the appropriate label "disclose coverage."

the scope of an insurance policy" (*Coverage*, Black's Law Dictionary [10th ed. 2014]). But Insurance Law § 3420(d)(1), provides only that the insurer disclose "whether the insured had a liability insurance policy [of a certain type] in effect with the insurer on the date of the alleged occurrence; and (ii) specify the liability insurance limits of the coverage provided under the policy." Conspicuously absent from this required disclosure is whether a given risk is included under an insurance policy—the dictionary definition of coverage. I take the majority's reasoning here as a warning not to play poker with any of them, because, should I call them, they will "disclose" their hand by laying the cards face down on the table, letting me see how many cards they have, not what hand they hold. That is not how our legislature intended insurers to treat policyholders.

The majority rejects this common-sense interpretation of Insurance Law § 3420(d) in part because it has placed undue emphasis on the distinction between the verb "disclose" and the verb "disclaim" without considering the context provided by the noun "coverage" (see generally Matter of James Q., 32 NY3d 671, 678 [2019] [a given statutory term "cannot be read in isolation . . . [r]ather, the term must be understood in context and with reference to the words and phrases adjacent to it"]; see also McKinney's Cons Laws of NY, Book 1, Statutes § 239 ["words employed in a statute are construed in connection with, and their meaning is ascertained by reference to the words and phrases with which they are associated"]). The difference between these verbs, on which the majority rests its analysis, collapses once it is understood that "disclaimer" is the means by which insurers "disclose"

the existence of *coverage*, as opposed to disclosing the existence of a policy, or the maximum paid per claim.[7]

That "disclaimer" operates as a form of "disclosure" of coverage is a function of the particular legal environment in which insurers operate. The law of every state provides that if an insurer affirms that the policyholder's claim is covered, then the insurer has lost many of its otherwise available coverage defenses (Restatement of Liability Insurance §§ 5, 6). The insurer then has two options if it does not want to throw away any coverage defenses: disclaim coverage (thus disclosing that coverage does not exist) or reserve its rights (keeping its determination of coverage hidden). The only way an insurer can "disclose coverage" is to affirm or disclaim coverage. In the absence of insurer affirmance or disclaimer, the only entity that can "disclose" coverage is a court through a declaratory judgment action—and insurers who force their policyholders to engage in litigation to acquire coverage, especially coverage that is clearly within the scope of the policy, are exactly the kind of insurers the legislature was thinking of when it defined unfair claims settlement practices (see Insurance Law § 2601[a][4], [5]). Yet the majority seems to

---

[7] The specific context of the insurance business also defeats the majority's effort to make a fortress out of the dictionary (see McKinney's Cons Laws of NY, Book 1, Statutes § 233 [words of technical or special meaning are not construed in their "ordinary" sense]; cf. Cabell v Markham, 148 F2d 737, 739 [2d Cir 1945] [Hand, J.]). It is certainly true that "disclose" and "deny" have different dictionary meanings, but in the specific context of insurance law a disclaimer or denial functions as disclosure of coverage, albeit in the negative sense, precisely because non-denial, unaccompanied by a reservation of rights, so often functions as a binding concession of coverage (see generally 13 Couch on Insurance § 198:01 *et seq* [discussing myriad cases in which insurer non-denials serve to waive coverage]).

believe that a law compelling the insurer to "promptly disclose coverage" (i.e., saving everyone from a trip to our State's judicial system) exists only to push every policyholder into "litigation regarding whether the insured or other claimant is entitled to a payout under the terms of the policy" (majority op at 9). I believe I speak on behalf of every policyholder in this state when I say: only in our nightmares.

The majority's second gyration is to argue that the legislative history of Insurance Law § 3420(d)(2) implies that the legislature meant to capture only (d)(1) in the text of Insurance Law § 2601(a)(6) and just plumb forgot to include the "(1)." To begin with, "we may not create a limitation that the Legislature did not enact" (Matter of Diegelman v City of Buffalo, 28 NY3d 231, 237 [2016] [internal quotation marks and citation omitted]; see Matter of Metropolitan Life Ins. Co. v Boland, 281 NY 357, 361 [1939] ["We are not privileged, by judicial construction, to legislate. If a change in the wording of the provision is desired, it must be made by the Legislature"]). Although it is true that the legislature amended § 2601(a)(6) in 2009 "to permit individuals suing an insured tortfeasor to initiate a simultaneous declaratory judgment action against the tortfeasor's insurer to challenge the denial of coverage based on late notice" (majority op at 12), the fact remains that a court "should construe unambiguous language to give effect to its plain meaning (Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006]), and "subsection (d)" unambiguously means "subsection (d)."

Even assuming "subsection (d)" was ambiguous such that we would look to legislative history, the majority's use of legislative history to explain why the legislature

said "subsection (d)" when it really meant "subsection (d)(1)" works against its own argument, and instead bolsters the case for including (d)(2) as an unfair claims practice. Consider a tort victim who receives the information required by subsection (d)(1): she knows that the tortfeasor has a "liability insurance policy" that purports to cover personal injuries (Insurance Law § 3420[d][1][B][i]; cf. Insurance Law § 3425 [listing the types of policies to which (d)(1) applies]) and she knows what the limits of the coverage provided under the policy are (Insurance Law § 3420[d][1][B][ii]). But she cannot yet sue the insurance company for a declaratory judgment action simultaneously with her suit against the tortfeasor. As CPLR 3001 and Insurance Law § 3420(a)(6) explain, an individual tort victim does not have the right to sue the insurance company directly until the insurer "disclaims liability or denies coverage" (see also L 2008 CH 338 [adding this limitation alongside the amendment making breach of Insurance Law § 3420(d) an unfair claims practice]). The balance the legislature struck between insurer and third-party claimant was simple: a tort victim could sue the tortfeasor's insurer directly, but only if the insurer was given an opportunity to investigate and disclaim first. To ensure that insurers did disclaim promptly, so as not to prejudice the injured party who wants to get on with a lawsuit against the tortfeasor and insurer in a single action, the requirement that insurers timely disclaim coverage was made an unfair claims settlement practice.

**B**

Finally, I note that even if the majority is completely correct about everything in its opinion, the majority has ignored the New York Insurance Department's decision to adopt,

pursuant to its powers under Insurance Law § 2601, the crucial portions of the text of

Insurance Law § 3420(d)(2) in 11 NYCRR 216.6(c), which provides: "Within 15 business

days after receipt by the insurer of a properly executed proof of loss and receipt of all items,

statements and forms which the insurer requested from the claimant, the claimant, or the

claimant's authorized representative, shall be advised in writing of the acceptance or

rejection of the claim by the insurer," with an ability of the insurer to extend this deadline

by appropriate notice to the claimant (it is undisputed that no such notice was sent here).

The legislature expressly provided that RRGs are bound not only by "the unfair claims

settlement provisions set forth in [Insurance Law § 2601]" but also by "any regulations

promulgated thereunder" (Insurance Law § 5904[d]). No one argues, or could argue, that

the LRRA's preemption exception may be invoked only by statute, and not by a duly

enacted regulation. Thus, even under the majority's extraordinarily crabbed theory, PCIC

loses because it must comply with the Commissioner's regulations, which require prompt

disclaimer or acceptance of coverage. I recognize that the parties did not mention the

regulations, but the danger of allowing the regulations to go unmentioned is that insurers,

policyholders, prospective policyholders and tort victims might erroneously understand the

majority's decision to require a reworking of the entire industry, when the result here would

have been reversed had these parties noticed the Commissioner's regulations.

## IV

Even if the majority is right to say that foreign RRGs are subject only to the laws

set out in Insurance Law § 5904, and even if the majority is right to say that Insurance Law

§ 3420(d)(2) is not such a law, Insurance Law § 3420(d)(2) would still apply to PCIC because its coverage of Nadkos put it in material breach of both the LRRA and Insurance Law Article 59; it was not a foreign RRG for purposes of this coverage dispute.

Neither the LRRA nor Article 59 exempts an RRG from generally applicable state insurance laws if that RRG acts outside of the federal limitations on what an RRG may do. Here, PCIC exceeded the scope of the LRRA and Article 59 by insuring Nadkos, a non-member of the RRG. Although, under the majority's holding, Insurance Law § 3420(d)(2) may not apply to the policy held by PCIC member Chesakl, regulation of PCIC's extra-curricular activities—namely, its insurance of Nadkos—was entirely outside of the LRRA's scope and well outside of the ambit of Article 59.[8]

Article 59 applies only to "risk retention groups . . . formed pursuant to the provisions of the federal [LRRA]" (Insurance Law § 5901). The definition of a risk retention group as a matter of state law was expressly amended in 1990, two years after Article 59 was adopted (L 1990 ch 128) to limit Article 59 to "any corporation or other limited liability association former pursuant to the federal [LRRA]" (Insurance Law § 5902[n]). The legislative history of the 1990 amendment explains that it was adopted to

---

[8] It is undisputed that PCIC provided insurance to Nadkos (and Partners LLC), a non-member. Indeed, that is what this case is entirely about. The policy language itself makes plain that Nadkos is an insured, as a 2012 endorsement amended the policy "to include as an additional insured any person or organization for whom you [Chesakl] are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy" (contrast Gilbane Bldg. Co./TDX Constr. Corp. v St. Paul Fire and Mar. Ins. Co., 31 NY3d 131, 135-137 [2018]).

"clarify that only risk retention groups formed pursuant to the LRRA are subject to the provisions of Article 59" (Insurance Department Mem, Bill Jacket, L 1990, ch 128 at 12). Just to ram the point home, the legislature went on to copy the federal definition of an RRG, word for word, into Article 59 (Insurance Law § 5902[n][7]). Whatever one understands the benefits conferred by Article 59 to be, the legislature determined that one must meet the definition of an RRG under federal law to enjoy them.

PCIC's coverage of Nadkos placed it outside the scope of the federal definition of an RRG. Congress defined RRGs as "any corporation or other limited liability association . . . whose activities do not include the provision of insurance other than . . . liability insurance for assuming and spreading all or any portion of the similar or related liability exposure of *its group members*" (15 USC § 3901[a][4][G] [emphasis added]). A company whose "activities" include the provision of insurance to non-members—here, through coverage of additional insureds like Nadkos that are not members of the RRG—is, therefore, not a "risk retention group" for the purposes of the LRRA's "exemption" from state law and therefore from the implied exemption from state law the majority reads into Article 59.

Contemplating the possibility that an RRG might find itself in breach of the LRRA's definitions that presumably would trigger action from the chartering state's insurance commissioner but leave non-chartering states with only ambiguous power over the rogue RRG, in 1986 Congress adopted the Risk Retention Amendments to limit the "exemption" scope of the law to encompass only "laws governing the insurance business pertaining to

liability insurance coverage provided by a risk retention group for such group or any person who is a member of such group" (15 USC § 3902[b][1]; see also H Rep 99-865 at 14-15), as well as other areas not relevant here. That amendment makes clear that RRGs are shielded from nonchartering state regulation when they stick to the safe harbor of member-only insurance prescribed by Congress, but fully exposed to the rigors of nonchartering state regulation if they provide liability insurance to nonmembers.

Congress did not allow RRGs to evade state insurance laws while defying Congress's restriction that RRGs insure only their own members and not third parties: "from its inception the scope of preemption authorized by Congress to effect the creation of risk retention groups turned upon the limited field of customers that those groups could serve. Risk retention groups were member financed and member servicing organizations only; the state's interest in regulating insurers dealing with the public was to remain untouched by this legislation" (Home Warranty Corp. v Caldwell, 777 F2d 1455, 1468 [11th Cir 1985]). Congress reasoned that precisely "[b]ecause risk retention groups will be providing insurance coverage only to their members, and not to the public at large, it is believed that regulation by the chartering jurisdiction will be sufficient to provide adequate supervision of these groups" (HR Rept 99-865 at 12, quoting S Rep 97-271 at 13 [concerning the original 1981 PLRRA]; see also Insurance Law § 5905[b][1] [banning RRGs from "the solicitation or sale of insurance to any person who is not eligible for membership in such group," i.e., nonmembers and non-potential-members])). When RRGs like PCIC go beyond that mandate and sell to nonmembers, the premise for the LRRA and

(on the majority's reading) Article 59 exemptions of RRGs from state insurance laws no longer applies.

This case provides a useful illustration of the soundness of Congress' and the New York Legislature's judgment that RRGs who insure non-members should be exposed to nonchartering state law like any other insurance provider. When the original injury claim was made, Chesakl received a thorough declination of coverage from PCIC within three business days; Chesakl was, after all, a co-owner of PCIC and PCIC's claims administrators had every incentive to be attentive to Chesakl's submissions (even if, as here, PCIC denied coverage). Assuming PCIC believed all along that it did not need to obey New York's untimely disclaimer law, it responded to Chesakl's claim with celerity, spurred no doubt by these incentives. But Nadkos, a non-member, got the silent treatment before receiving, nearly three months later, a near-carbon-copy of the Chesakl declination letter. PCIC had no incentive, other than the law, to respond to Nadkos speedily, and every incentive to minimize any potential payout to Nadkos as an additional insured because, unlike payouts to a member that are essential for PCIC's viability (its member construction companies would desert it if it took in premiums but never paid claims), payouts to Nadkos would simply be taking money away from its membership.[9]

---

[9] It is also possible that Nadkos was never an additional insured because the PCIC policy's additional insured endorsement adds Nadkos only if Chesakl had contracted to add Nadkos on "your policy," i.e., the PCIC policy, and the parties never agreed to add Nadkos to the PCIC policy per se. Instead, Chesakl and Nadkos agreed that Chesakl would name Nadkos as an additional insured on a liability insurance policy that covered "all claims . . . arising

Neither the LRRA nor Article 59 exempts RRGs from state regulation when RRGs provide insurance to non-members, especially when, in contrast to situations where the RRG itself is being sued by an outsider (see Wadsworth v Allied Professionals Ins. Co., 748 F3d 100, 108 [2d Cir 2014]), the coverage being contested is coverage the RRG was never authorized—by New York, by Montana, or by Congress—to provide.

## V

Because I would hold that Article 59 is no obstacle to applying Insurance Law 3420(d)(2) to the policy and claim at issue in this case—either because Insurance Law § 3420(d)(2) applies to the policy on its own terms, or because it is encompassed as an unfair claims practice that is expressly applied to foreign RRGs by Article 59, or because PCIC's issuance of insurance to a nonmember removed it from Article 59, I must address the question the Appellate Division rested its decision upon, the parties briefed, and the majority avoids: does the LRRA exempt PCIC from compliance with Insurance Law § 3420(d)(2)?

I would hold it is not, for two reasons. First, as I discussed immediately above, the LRRA (like the identically-worded provisions of Article 59) does not exempt foreign

---

out of or resulting from performance of [Chesakl's] work . . . attributable to bodily injury . . . to the extent caused by the negligent acts or omissions of [Chesakl]." The PCIC policy concededly did not provide anything close to that level of protection for Nadkos or Chesakl. Because that question could not have been avoided if it had been raised below (cf. Persky v Bank of Am. Nat. Assn, 261 NY 212, 216 [1933]), it was open to us to remand the case to Supreme Court to determine that narrow contractual issue without launching into a major public policy question with implications for every insured in the State.

RRGs from *any* state regulation when foreign RRGs are acting outside their federally-defined role insuring only their own members.

Second, the LRRA exempts, and was intended to exempt, only what *federal* law understood to be state unfair claims practices law and as a matter of federal law. Insurance Law § 3420(d)(2) is part of New York's unfair claims practices law. As an initial matter, a State's *ipse dixit* as to what constitutes an unfair claim settlement practices law cannot determine federal preemption. If it could, a State could invent all manner of onerous restrictions on foreign RRGs, aimed at making them unviable, and escape LRRA preemption by labelling them "unfair claims settlement practices law." Conversely, the list of items in Insurance Law § 2601(a) cannot be an exhaustive list of the unfair claims settlement practices law by which RRGs must abide, in part because Insurance Law § 2601(a) does not so provide; it simply lists indicative examples of unfair claims settlement practices, but does not purport to be exhaustive. If it were, then bans on invidious discrimination in claims settlement, for example, which is codified only four sections later (Insurance Law §§ 2606-08) would not bind foreign RRGs—a conclusion that would fly in the face of Congressional intent that state "civil rights laws" are not preempted by the LRRA (HR Rept 97-190 at 13 [original 1981 law]; HR Rept 99-865 at 16 [1986 amendments]).

To determine whether Insurance Law § 3420(d)(2) is part of the State's "unfair claims settlement practices law" under the LRRA, then, we need to know what this statutory phrase means as a matter of federal law, not state law. "The purpose of Congress

is the ultimate touchstone in every pre-emption case" (<u>Medtronic, Inc. v Lohr</u>, 518 US 470, 485-86 [1996] [internal citations and quotations omitted]):

> "As a result, any understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of congressional purpose. Congress's intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law"

"Unfair claims settlement practices law" is not defined in the LRRA, and no federal court has yet opined on what that phrase means in the LRRA or what the term meant in 1981 or 1986. However, "claims settlement practices" was and is a well-understood term in insurance law: it refers to the process where insurers receive claims on the policy, evaluate those claims, determine whether the claim is covered, and then pay to the claimant all or part of the claimed amount with an explanation of what was covered, what was not covered, and why (<u>see e.g.</u> <u>Union Labor Life Ins. Co. v Pireno</u>, 458 US 119, 135 [1982] [Rehnquist, J., dissenting] [discussing medical insurance claims settlement practices]; <u>Pathway Bellows, Inc. v Blanchette</u>, 630 F2d 900, 903 [2d Cir 1980] [discussing claims settlement in terms of carriers' voluntary disposition of claims]). The legislative history of the LRRA is also instructive. When the "unfair claims settlement practices of the state" language was written into the Act in 1981, the House and Senate committees each explained the purpose of the exemption (H Rep 97-190 at 14; S Rep 97-172 at 12):

> Subparagraph (A) is intended to provide persons injured within a State with the same rights regarding settlement practices against a risk retention group as they would otherwise have against a licensed insurer.

The legislative history strongly suggests that all state laws regarding "settlement practices" apply with full force against RRGs, not merely a selection of those laws—otherwise "persons injured within a State" would not have "the same rights regarding settlement practices against an RRG as they would otherwise have against a licensed insurer." Congress' intent was further emphasized by amendments in 1986 that exempted state unfair trading laws from LRRA's preemption. As the Seventh Circuit explained: "Congress sought to 'augment[ ] the authority of nonchartering states to regulate solvency, trade practices and other matters' and 'contemplated that States may enact statutes and issue regulations to protect the public to the extent such action is not exempt by th[e] Act'" (Ophthalmic Mut. Ins. Co. v Musser, 143 F3d 1062, 1067 [7th Cir 1998] [quoting HR Rep No 865 at 18 (1986), reprinted in 1986 U.S.C.C.A.N. 5303-04, 5315; H.R. Rep. 99–865 at 38 (1986), reprinted in 1986 U.S.C.C.A.N. 5303, 1986 WL 31938]).

Congress also knew at least a list of indicative examples of "unfair claims practices laws" because the National Association of Insurance Commissioners, then and now the pre-eminent organization of insurance regulators in the United States,[10] had in 1971

---

[10] See generally Susan Randall, *Insurance Regulation in the United States: Regulatory Federalism and the National Association of Insurance Commissioners*, 26 Fla St U L Rev 625 [1999]).

adopted an amendment to the Uniform Unfair Trade Practices Act listing examples of unfair claims settlement practices. That list of "unfair claims settlement practices" included, at Section 4(9), "failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed" (Proceedings of the National Association of Insurance Commissioners, 1972-4 NAIC Proc. 490, 496 [1971] [adopting the revised and restated Model Unfair Methods of Competition and Unfair and Deceptive Practices Act]). That part of the Uniform Act remained unchanged until 1990, when it was broken out into a separate proposed Uniform Unfair Claims Settlement Practices Act (see National Association of Insurance Commissioners, *Unfair Claims Settlement Practices Act* [1997], https://www.naic.org/store/free/MDL-900.pdf).[11] The 1971 Uniform Act, as well as its successors and predecessors, was and remains the national standard: today, 45 states, including Montana, declare that "failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed" is an unfair claims practice—notwithstanding common law waiver or estoppel doctrines.[12]

---

[11] I would not hold that only those unfair claims practices laws that are listed in the 1971 NAIC Model Act, or similarly situated laws, would fall under the federal definition of "unfair claims settlement practices." However, it is reasonable to conclude that the NAIC Model Act set out commonly understood instances of conduct constituting "unfair claims settlement practices," which common understanding should be imputed to Congress absent contrary evidence in the LRRA or its legislative history.

[12] Alaska Stat § 21.36.125; Ariz Rev Stat § 20-461; Ark Code Ann § 23-66-206; Cal Ins Code § 790.03; Colo Rev Stat. § 10-3-1104; Conn Gen Stat § 38a-816; Del Code Ann tit 18, § 2304; Fla Stat Ann § 626.9541; Ga Code Ann § 33-6-34; Haw Rev Stat § 431:13-103; Idaho Code § 41-1329; Ill Comp Stat § 5/154.6; Ind Code § 27-4-1-4.5; Iowa Code § 507B.4; Kan Stat Ann § 40-2404; Ky Rev Stat Ann § 304.12-230; La Rev Stat Ann

Congress deliberately provided that foreign RRGs would not be exempt from "the unfair claims settlement practices law of the state." Congress presumably knew that virtually all states had an unfair claims settlement practice law that forbade "failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed." Thus, Congress did not intend the LRRA to preempt Insurance Law § 3420(d)(2), which requires—in common with almost all other states—that an insurer must "give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured." New York has interpreted the language of its untimely disclaimer law as being stricter than similarly-worded statutes in some other states (see e.g. Liberty Ins. Corp. v Tinplate Purch. Corp., 643 F Supp 2d 406, 416–417 [D NJ 2010] [noting that under New Jersey law an insured must show prejudice arising from the unreasonable delay in disclaiming coverage]; Heyman Assocs. No. 1 v Insurance Co. of State of Pa., 231 Conn. 756, 777-778 [1995] [holding insurance company's delayed denial of coverage did not waive exclusion defense, and rejecting insured's reliance on New York's statutory disclaimer requirements]), but Congress knew states would have

---

§ 22:1214; Md Code Ann, Ins § 27-304; Mass Gen Laws Ann 176D § 3; Mich Comp Laws § 500.2026; Minn. Stat. § 72A.20; Mo. Rev Stat § 375.936; Mont Code Ann § 33-18-201; Neb Rev Stat Ann § 44-1540; Nev Rev Stat § 686A.310; NH Rev Stat Ann § 417:4; NJ Stat Ann § 17:29B-4; NM Stat Ann § 59A-16-20; NC Gen. Stat. § 58-63-15; ND Cent Code Ann 26.1-04-03; Or Rev Stat § 746.230; 40 Pa Cons Stat § 1171.5; RI Gen Laws Ann § 27-9.1-4; SD Codified Law § 58-33-67; Tenn Code Ann § 56-8-105; Tex Ins Code Ann art 21.21; Utah Code Ann § 31A-26-303; Vt Stat Ann tit 8, § 4724; Va Code Ann § 38.2-510; Wash Admin Code 284-30-330; WVa Code § 33-11-4; Wyo Stat Ann. § 26-13-124. In addition to 45 states, the District of Columbia and Puerto Rico have adopted substantially identical language in their unfair claims practices law (26 L.P.R.A. § 2716a; DC Code Ann § 31-2231.17).

heterogeneous unfair claims practices laws, or at least heterogeneous interpretations of unfair claims practices laws, and nonetheless exempted them wholesale from preemption. By adopting the exclusion in 15 USC § 3903(a)(1)(A), Congress decided that in the realm of unfair claims practices laws, the normal interplay of state law as enshrined in the McCarran-Ferguson Act (15 USC § 1011, et seq.) would apply to RRGs notwithstanding the burden divergent state regulation always places on interstate businesses (see generally Altria Group Inc v. Good, 555 US 70, 77 [2008] ["the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States" (internal citations omitted)]).

Congress's decision also made good policy sense. The point of RRGs is to allow the formation of entities to provide insurance coverage where conventional insurers had not offered coverage at reasonable prices, both so that coverage would be available and as a way to inject competition into markets increasingly marked by a small number of quasi-monopolistic carriers setting premiums with little relation to the underlying risk profile involved (see HR Rept 97-190 at 22; S Rept 97-172 at 2-3). That purpose is defeated if an RRG refuses to pay covered claims, or delays determining coverage, or otherwise deprives the insured of the full benefit of its liability insurance coverage. Congress had no interest in policing bad insurer behavior itself, and was keenly aware that (in 1981, when the unfair claims settlement practices exemption was adopted) most RRGs were chartered in Bermuda or the Cayman Islands, which were not prepared to serve as general watchdogs

for the burgeoning RRG sector Congress hoped to create (HR Rept 97-190 at 5-6, 11; S Rept 97-172 at 9-10). Instead, Congress looked to the traditional enforcers of unfair claims practices law: the nonchartering states where claimants were based.

Once we accept that the scope of federal preemption is determined by Congress' intent and that Insurance Law § 3420(d)(2) falls into the LRRA's exemption as an "unfair claims settlement practices law of the State," it becomes irrelevant to the analysis that New York has applied its unfair claims settlement practice law in a manner different from other states. Congress knew full well that different states had different ways of going about unfair claims settlement practice enforcement and was content to let them make that choice, provided that their enforcement stayed within the bounds of claims practices and did not extend to other areas of RRG operations, such as minimum capitalization and the like. Moreover, concerns about the burden of complying with different states' rules appear to be at their lowest ebb in cases like these, where every state requires some form of diligence in issuing a disclaimer to an insured as a matter of statute law.[13] That PCIC has no difficulty abiding by the rule of New York—which really is just a stricter time limit than other

---

[13] In addition to the 45 states that have adopted the NAIC language (see note 14, above), a few other states have an untimely disclaimer rule worded somewhat differently from the NAIC language (Me Rev Stat T. 24-A § 2164-D ["(f)ailing to affirm coverage or deny coverage, reserving any appropriate defenses, within a reasonable time"]; Okla Stat Ann T. 36 § 1250.7 [setting out a complex set of rules on timeliness of disclaimer]; Wis Stat Ann 628.46 [same]; Ohio Admin Code 3901-1-54 [same]; SC Code Ann § 38-59-20 [requiring "prompt settlement"]). Only Alabama, Mississippi, and possibly Guam and the Northern Mariana Islands appear not to include substantially similar language in their codes.

states—is vividly illustrated by the ease with which PCIC disclaimed coverage to Chesakl, well within the New York time limits, and the striking resemblance Nadkos's eventual denial letter bore to the Chesakl letter. PCIC itself, in the very letter denying coverage to Nadkos, did not refer Nadkos to the Montana Insurance Commissioner if it objected to disclaimer; it itself relied on the New York Insurance Department to field complaints. If New York is good enough for PCIC, it should be good enough for PCIC.

## VI

In sum, then: (1) Insurance Law § 3420(d)(2) applies to the insurance policy here on its own terms; (2) even if Article 59 could be read to render Insurance Law § 3420(d)(2) inapplicable to policies issued by foreign RRGs like PCIC, it would apply here because it is an "unfair claims settlement practice" law that Article 59 affirmatively obliges foreign RRGs to obey; (3) even if Insurance Law § 3420(d)(2) is not an unfair claims settlement practice and therefore does not apply to foreign RRGs as a matter of state law, the Commissioner of Insurance has implemented the requirement by regulation, to which PCIC must adhere; (4) even if the regulation did not apply, Insurance Law § 3420(d)(2) would still apply here because PCIC was never authorized to insure Nadkos, which means PCIC has operated outside of the sphere authorized by Congress or Article 59, so that it is not entitled to claim any federal or state exemption from the full panoply of New York laws applicable generally to liability insurers. Finally, having held that Insurance Law § 3420(d)(2) applies to PCIC as a matter of state law, I would find that it is not preempted by the LRRA.

The majority now insists the legislature (or possibly the Insurance Commissioner) reclarify what is already clear. This case could have been decided in a way that provided clarity and advantages to all: yes you may have a cookie, or no you may not. Instead, the majority's decision is confusing and damaging to policyholders and accident victims everywhere. I respectfully dissent.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order affirmed, with costs.  Opinion by Judge Rivera.  Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur.  Judge Wilson dissents in an opinion.

Decided June 11, 2019